BREWER, WARDEN *v.* WILLIAMS

No. 74–1263.   Argued October 4, 1976—Decided March 23, 1977

Stewart, J., delivered the opinion of the Court, in which Brennan, Marshall, Powell, and Stevens, JJ., joined. Marshall, J., *post*, p. 406, Powell, J., *post*, p. 409, and Stevens, J., *post*, p. 414, filed concurring opinions. Burger, C. J., filed a dissenting opinion, *post*, p. 415. White, J., filed a dissenting opinion, in which Blackmun and Rehnquist, JJ., joined, *post*, p. 429. Blackmun, J., filed a dissenting opinion, in which White and Rehnquist, JJ., joined, *post*, p. 438.

*Richard C. Turner,* Attorney General of Iowa, and *Richard N. Winders,* Assistant Attorney General, argued the cause and filed briefs for petitioner.

*Robert Bartels* by appointment of the Court, 423 U. S. 1044, argued the cause and filed a brief for respondent.*

Mr. Justice Stewart delivered the opinion of the Court.

An Iowa trial jury found the respondent, Robert Williams, guilty of murder. The judgment of conviction was affirmed in the Iowa Supreme Court by a closely divided vote. In a subsequent habeas corpus proceeding a Federal District

---

*William J. Guste, Jr.,* Attorney General, and *Walter L. Smith, Jr.,* Assistant Attorney General, filed a brief for the State of Louisiana as *amicus curiae.*

*Fred E. Inbau* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging reversal, joined by *Wayne W. Schmidt* and by officials for their respective States as follows: *William J. Baxley,* Attorney General of Alabama; *Bruce E. Babbitt,* Attorney General of Arizona, and *Frank T. Galati,* Assistant Attorney General; *James Guy Tucker,* Attorney General of Arkansas; *Evelle J. Younger,* Attorney General of California, and *William E. James,* Senior Assistant Attorney General; *Robert L. Shevin,* Attorney General of Florida, and *E. J. Salcines, Jr.; Wayne L. Kidwell,* Attorney General of Idaho, and *Christopher D. Bray,* Deputy Attorney General; *William J. Scott,* Attorney General of Illinois, and *James B. Zagel,* Assistant Attorney General; *Theodore L. Sendak,* Attorney General of Indiana, and *Donald P. Bogard,* Executive Assistant Attorney General; *Francis B. Burch,* Attorney General of Maryland; *A. F. Summer,* Attorney General of Mississippi, and *Karen Gilfoy,* Assistant Attorney General; *Paul L. Douglas,* Attorney General of Nebraska, and *Melvin K. Kamerlohr,* Assistant Attorney General; *Robert List,* Attorney General of Nevada; *William F. Hyland,* Attorney General of New Jersey, and *Robert Del Tufo,* First Assistant Attorney General; *Louis J. Lefkowitz,* Attorney General of New York, and *Samuel A. Hirshowitz,* First Assistant Attorney General; *Allen I. Olson,* Attorney General of North Dakota; *Larry Derryberry,* Attorney General of Oklahoma, and *Robert McDonald; Daniel R. McLeod,* Attorney General of South Carolina; *Vernon B. Romney,* Attorney General of Utah, and *William W. Barrett,* Assistant Attorney General; *Andrew P. Miller,* Attorney General of Virginia, and *Reno S. Harp III,* Deputy Attorney General; *Chauncey H. Browning, Jr.,* Attorney General of West Virginia, and *David P. Cleek,* Assistant Attorney General; and *V. Frank Mendicino,* Attorney General of Wyoming, and *Gerald A. Stack,* Deputy Attorney General.

Court ruled that under the United States Constitution Williams is entitled to a new trial, and a divided Court of Appeals for the Eighth Circuit agreed. The question before us is whether the District Court and the Court of Appeals were wrong.

I

On the afternoon of December 24, 1968, a 10-year-old girl named Pamela Powers went with her family to the YMCA in Des Moines, Iowa, to watch a wrestling tournament in which her brother was participating. When she failed to return from a trip to the washroom, a search for her began. The search was unsuccessful.

Robert Williams, who had recently escaped from a mental hospital, was a resident of the YMCA. Soon after the girl's disappearance Williams was seen in the YMCA lobby carrying some clothing and a large bundle wrapped in a blanket. He obtained help from a 14-year-old boy in opening the street door of the YMCA and the door to his automobile parked outside. When Williams placed the bundle in the front seat of his car the boy "saw two legs in it and they were skinny and white." Before anyone could see what was in the bundle Williams drove away. His abandoned car was found the following day in Davenport, Iowa, roughly 160 miles east of Des Moines. A warrant was then issued in Des Moines for his arrest on a charge of abduction.

On the morning of December 26, a Des Moines lawyer named Henry McKnight went to the Des Moines police station and informed the officers present that he had just received a long-distance call from Williams, and that he had advised Williams to turn himself in to the Davenport police. Williams did surrender that morning to the police in Davenport, and they booked him on the charge specified in the arrest warrant and gave him the warnings required by *Miranda v. Arizona,* 384 U. S. 436. The Davenport police then tele-

phoned their counterparts in Des Moines to inform them that Williams had surrendered. McKnight, the lawyer, was still at the Des Moines police headquarters, and Williams conversed with McKnight on the telephone. In the presence of the Des Moines chief of police and a police detective named Leaming, McKnight advised Williams that Des Moines police officers would be driving to Davenport to pick him up, that the officers would not interrogate him or mistreat him, and that Williams was not to talk to the officers about Pamela Powers until after consulting with McKnight upon his return to Des Moines. As a result of these conversations, it was agreed between McKnight and the Des Moines police officials that Detective Leaming and a fellow officer would drive to Davenport to pick up Williams, that they would bring him directly back to Des Moines, and that they would not question him during the trip.

In the meantime Williams was arraigned before a judge in Davenport on the outstanding arrest warrant. The judge advised him of his *Miranda* rights and committed him to jail. Before leaving the courtroom, Williams conferred with a lawyer named Kelly, who advised him not to make any statements until consulting with McKnight back in Des Moines.

Detective Leaming and his fellow officer arrived in Davenport about noon to pick up Williams and return him to Des Moines. Soon after their arrival they met with Williams and Kelly, who, they understood, was acting as Williams' lawyer. Detective Leaming repeated the *Miranda* warnings, and told Williams:

> "[W]e both know that you're being represented here by Mr. Kelly and you're being represented by Mr. McKnight in Des Moines, and . . . I want you to remember this because we'll be visiting between here and Des Moines."

Williams then conferred again with Kelly alone, and after this conference Kelly reiterated to Detective Leaming that

392

Williams was not to be questioned about the disappearance of Pamela Powers until after he had consulted with McKnight back in Des Moines. When Leaming expressed some reservations, Kelly firmly stated that the agreement with McKnight was to be carried out—that there was to be no interrogation of Williams during the automobile journey to Des Moines. Kelly was denied permission to ride in the police car back to Des Moines with Williams and the two officers.

The two detectives, with Williams in their charge, then set out on the 160-mile drive. At no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney. Instead, he stated several times that "[w]hen I get to Des Moines and see Mr. McKnight, I am going to tell you the whole story." Detective Leaming knew that Williams was a former mental patient, and knew also that he was deeply religious.

The detective and his prisoner soon embarked on a wide-ranging conversation covering a variety of topics, including the subject of religion. Then, not long after leaving Davenport and reaching the interstate highway, Detective Leaming delivered what has been referred to in the briefs and oral arguments as the "Christian burial speech." Addressing Williams as "Reverend," the detective said:

> "I want to give you something to think about while we're traveling down the road. . . . Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into

Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all."

Williams asked Detective Leaming why he thought their route to Des Moines would be taking them past the girl's body, and Leaming responded that he knew the body was in the area of Mitchellville—a town they would be passing on the way to Des Moines.[1] Leaming then stated: "I do not want you to answer me. I don't want to discuss it any further. Just think about it as we're riding down the road."

As the car approached Grinnell, a town approximately 100 miles west of Davenport, Williams asked whether the police had found the victim's shoes. When Detective Leaming replied that he was unsure, Williams directed the officers to a service station where he said he had left the shoes; a search for them proved unsuccessful. As they continued towards Des Moines, Williams asked whether the police had found the blanket, and directed the officers to a rest area where he said he had disposed of the blanket. Nothing was found. The car continued towards Des Moines, and as it approached Mitchellville, Williams said that he would show the officers where the body was. He then directed the police to the body of Pamela Powers.

Williams was indicted for first-degree murder. Before trial, his counsel moved to suppress all evidence relating to or resulting from any statements Williams had made during the automobile ride from Davenport to Des Moines. After

---

[1] The fact of the matter, of course, was that Detective Leaming possessed no such knowledge.

an evidentiary hearing the trial judge denied the motion. He found that "an agreement was made between defense counsel and the police officials to the effect that the Defendant was not to be questioned on the return trip to Des Moines," and that the evidence in question had been elicited from Williams during "a critical stage in the proceedings requiring the presence of counsel on his request." The judge ruled, however, that Williams had "waived his right to have an attorney present during the giving of such information." [2]

The evidence in question was introduced over counsel's continuing objection at the subsequent trial. The jury found Williams guilty of murder, and the judgment of conviction was affirmed by the Iowa Supreme Court, a bare majority of whose members agreed with the trial court that Williams had "waived his right to the presence of his counsel" on the automobile ride from Davenport to Des Moines. *State v. Williams*, 182 N. W. 2d 396, 402. The four dissenting justices expressed the view that "when counsel and police have agreed defendant is not to be questioned until counsel is present and defendant has been advised not to talk and repeatedly has stated he will tell the whole story after he talks with counsel, the state should be required to make a stronger showing of intentional voluntary waiver than was made here." *Id.*, at 408.

Williams then petitioned for a writ of habeas corpus in the United States District Court for the Southern District of Iowa. Counsel for the State and for Williams stipulated that "the case would be submitted on the record of facts and proceedings in the trial court, without taking of further testimony." The District Court made findings of fact as summarized above, and concluded as a matter of law that the evidence in question had been wrongly admitted at

---

[2] The opinion of the trial court denying Williams' motion to suppress is unreported.

Williams' trial. This conclusion was based on three alternative and independent grounds: (1) that Williams had been denied his constitutional right to the assistance of counsel; (2) that he had been denied the constitutional protections defined by this Court's decisions in *Escobedo* v. *Illinois,* 378 U. S. 478, and *Miranda* v. *Arizona,* 384 U. S. 436; and (3) that in any event, his self-incriminatory statements on the automobile trip from Davenport to Des Moines had been involuntarily made. Further, the District Court ruled that there had been no waiver by Williams of the constitutional protections in question. 375 F. Supp. 170.

The Court of Appeals for the Eighth Circuit, with one judge dissenting, affirmed this judgment, 509 F. 2d 227, and denied a petition for rehearing en banc. We granted certiorari to consider the constitutional issues presented. 423 U. S. 1031.

## II

### A

Before turning to those issues, we must consider the petitioner's threshold claim that the District Court disregarded the provisions of 28 U. S. C. § 2254 (d) in making its findings of fact in this case. That statute, which codifies most of the criteria set out in *Townsend* v. *Sain,* 372 U. S. 293, provides that, subject to enumerated exceptions, federal habeas corpus courts shall accept as correct the factual determinations made by the courts of the States.[3]

---

[3] Title 28 U. S. C. § 2254 (d) provides:

"(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be

We conclude that there was no disregard of § 2254 (d) in this case. Although either of the parties might well have requested an evidentiary hearing in the federal habeas corpus proceedings, *Townsend* v. *Sain, supra,* at 322, they both instead voluntarily agreed in advance that the federal court should decide the case on the record made in the courts of the State. In so proceeding, the District Court made no

presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

"(1) that the merits of the factual dispute were not resolved in the State court hearing;

"(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

"(3) that the material facts were not adequately developed at the State court hearing;

"(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

"(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

"(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

"(7) that the applicant was otherwise denied due process of law in the State court proceeding;

"(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

"And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous."

findings of fact in conflict with those of the Iowa courts. The District Court did make some additional findings of fact based upon its examination of the state-court record, among them the findings that Kelly, the Davenport lawyer, had requested permission to ride in the police car from Davenport to Des Moines and that Detective Leaming had refused this request. But the additional findings were conscientiously and carefully explained by the District Court, 375 F. Supp., at 175–176, and were reviewed and approved by the Court of Appeals, which expressly held that "the District Court correctly applied 28 U. S. C. § 2254 in its resolution of the disputed evidentiary facts, and that the facts as found by the District Court had substantial basis in the record," 509 F. 2d, at 231. The strictures of 28 U. S. C. § 2254 (d) require no more.[4]

## B

As stated above, the District Court based its judgment in this case on three independent grounds. The Court of Appeals appears to have affirmed the judgment on two of those grounds.[5] We have concluded that only one of them need be considered here.

Specifically, there is no need to review in this case the doctrine of *Miranda* v. *Arizona,* a doctrine designed to secure the constitutional privilege against compulsory self-incrimination, *Michigan* v. *Tucker,* 417 U. S. 433, 438–439. It is equally unnecessary to evaluate the ruling of the District Court that Williams' self-incriminating statements were, indeed, involuntarily made. Cf. *Spano* v. *New York,* 360 U. S. 315. For it is clear that the judgment before us must in any event be affirmed upon the ground that Williams was deprived

---

[4] Whether Williams waived his constitutional rights was not, of course, a question of fact, but an issue of federal law. See discussion, *infra,* at 401–404.

[5] The Court of Appeals did not address the District Court's ruling that Williams' statements had been made involuntarily.

of a different constitutional right—the right to the assistance of counsel.

This right, guaranteed by the Sixth and Fourteenth Amendments, is indispensable to the fair administration of our adversary system of criminal justice. Its vital need at the pretrial stage has perhaps nowhere been more succinctly explained than in Mr. Justice Sutherland's memorable words for the Court 44 years ago in *Powell* v. *Alabama*, 287 U. S. 45, 57:

> "[D]uring perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself."

There has occasionally been a difference of opinion within the Court as to the peripheral scope of this constitutional right. See *Kirby* v. *Illinois*, 406 U. S. 682; *Coleman* v. *Alabama*, 399 U. S. 1. But its basic contours, which are identical in state and federal contexts, *Gideon* v. *Wainwright*, 372 U. S. 335; *Argersinger* v. *Hamlin*, 407 U. S. 25, are too well established to require extensive elaboration here. Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—"whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby* v. *Illinois, supra,* at 689. See *Powell* v. *Alabama, supra; Johnson* v. *Zerbst*, 304 U. S. 458; *Hamilton* v. *Alabama*, 368 U. S. 52; *Gideon* v. *Wainwright, supra; White* v. *Maryland,* 373 U. S. 59; *Massiah* v. *United States*, 377 U. S. 201; *United*

*States* v. *Wade,* 388 U. S. 218; *Gilbert* v. *California,* 388 U. S. 263; *Coleman* v. *Alabama, supra.*

There can be no doubt in the present case that judicial proceedings had been initiated against Williams before the start of the automobile ride from Davenport to Des Moines. A warrant had been issued for his arrest, he had been arraigned on that warrant before a judge in a Davenport courtroom, and he had been committed by the court to confinement in jail. The State does not contend otherwise.

There can be no serious doubt, either, that Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as—and perhaps more effectively than—if he had formally interrogated him. Detective Leaming was fully aware before departing for Des Moines that Williams was being represented in Davenport by Kelly and in Des Moines by McKnight. Yet he purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible. Indeed, Detective Leaming conceded as much when he testified at Williams' trial:

> "Q. In fact, Captain, whether he was a mental patient or not, you were trying to get all the information you could before he got to his lawyer, weren't you?
>
> "A. I was sure hoping to find out where that little girl was, yes, sir.
>
> .        .        .        .        .
>
> "Q. Well, I'll put it this way: You was [*sic*] hoping to get all the information you could before Williams got back to McKnight, weren't you?
>
> "A. Yes, sir." [6]

---

[6] Counsel for petitioner, in the course of oral argument in this Court, acknowledged that the "Christian burial speech" was tantamount to interrogation:

"Q: But isn't the point, really, Mr. Attorney General, what you indi-

The state courts clearly proceeded upon the hypothesis that Detective Leaming's "Christian burial speech" had been tantamount to interrogation. Both courts recognized that Williams had been entitled to the assistance of counsel at the time he made the incriminating statements.[7] Yet no such constitutional protection would have come into play if there had been no interrogation.

The circumstances of this case are thus constitutionally indistinguishable from those presented in *Massiah* v. *United States, supra.* The petitioner in that case was indicted for violating the federal narcotics law. He retained a lawyer, pleaded not guilty, and was released on bail. While he was free on bail a federal agent succeeded by surreptitious means in listening to incriminating statements made by him. Evidence of these statements was introduced against the petitioner at his trial, and he was convicted. This Court reversed the conviction, holding "that the petitioner was denied the basic protections of that guarantee [the right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U. S., at 206.

That the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant. See *ibid.; McLeod* v. *Ohio,* 381 U. S. 356; *United States* v. *Crisp,* 435 F. 2d 354, 358 (CA7);

---

cated earlier, and that is that the officer wanted to elicit information from Williams—

"A: Yes, sir.

"Q: —by whatever techniques he used, I would suppose a lawyer would consider that he were pursuing interrogation.

"A: It is, but it was very brief." Tr. of Oral Arg. 17.

[7] The Iowa trial court expressly acknowledged Williams' "right to have an attorney present during the giving of such information." See *supra,* at 394. The Iowa Supreme Court also expressly acknowledged Williams' "right to the presence of his counsel." See *ibid.*

*United States ex rel. O'Connor* v. *New Jersey,* 405 F. 2d 632, 636 (CA3); *Hancock* v. *White,* 378 F. 2d 479 (CA1). Rather, the clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him.[8] It thus requires no wooden or technical application of the *Massiah* doctrine to conclude that Williams was entitled to the assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments.

## III

The Iowa courts recognized that Williams had been denied the constitutional right to the assistance of counsel.[9] They held, however, that he had waived that right during the course of the automobile trip from Davenport to Des Moines. The state trial court explained its determination of waiver as follows:

> "The time element involved on the trip, the general circumstances of it, and more importantly the absence on the Defendant's part of any assertion of his right or desire not to give information absent the presence of his attorney, are the main foundations for the Court's conclusion that he voluntarily waived such right."

---

[8] The only other significant factual difference between the present case and *Massiah* is that here the police had *agreed* that they would not interrogate Williams in the absence of his counsel. This circumstance plainly provides petitioner with no argument for distinguishing away the protection afforded by *Massiah.*

It is argued that this agreement may not have been an enforceable one. But we do not deal here with notions of offer, acceptance, consideration, or other concepts of the law of contracts. We deal with constitutional law. And every court that has looked at this case has found an "agreement" in the sense of a commitment made by the Des Moines police officers that Williams would not be questioned about Pamela Powers in the absence of his counsel.

[9] See n. 7, *supra.*

In its lengthy opinion affirming this determination, the Iowa Supreme Court applied "the totality-of-circumstances test for a showing of waiver of constitutionally-protected rights in the absence of an express waiver," and concluded that "evidence of the time element involved on the trip, the general circumstances of it, and the absence of any request or expressed desire for the aid of counsel before or at the time of giving information, were sufficient to sustain a conclusion that defendant did waive his constitutional rights as alleged." 182 N. W. 2d, at 401, 402.

In the federal habeas corpus proceeding the District Court, believing that the issue of waiver was not one of fact but of federal law, held that the Iowa courts had "applied the wrong constitutional standards" in ruling that Williams had waived the protections that were his under the Constitution. 375 F. Supp., at 182. The court held "that it is the *government* which bears a heavy burden . . . but that is the burden which explicitly was placed on [Williams] by the state courts." *Ibid.* (emphasis in original). After carefully reviewing the evidence, the District Court concluded:

"[U]nder the proper standards for determining waiver, there simply is no evidence to support a waiver. . . . [T]here is no affirmative indication . . . that [Williams] did waive his rights. . . . [T]he state courts' emphasis on the absence of a demand for counsel was not only legally inappropriate, but factually unsupportable as well, since Detective Leaming himself testified that [Williams], on several occasions during the trip, indicated that he would talk *after* he saw Mr. McKnight. Both these statements and Mr. Kelly's statement to Detective Leaming that [Williams] would talk only after seeing Mr. McKnight in Des Moines certainly were assertions of [Williams'] 'right or desire not to give information absent the presence of his attorney . . . .' Moreover, the statements were obtained only after Detec-

tive Leaming's use of psychology on a person whom he knew to be deeply religious and an escapee from a mental hospital—with the specific intent to elicit incriminating statements. In the face of this evidence, the State has produced no affirmative evidence whatsoever to support its claim of waiver, and, a fortiori, it cannot be said that the State has met its 'heavy burden' of showing a knowing and intelligent waiver of . . . Sixth Amendment rights." *Id.,* at 182–183 (emphasis in original; footnote omitted).

The Court of Appeals approved the reasoning of the District Court:

"A review of the record here . . . discloses no facts to support the conclusion of the state court that [Williams] had waived his constitutional rights other than that [he] had made incriminating statements. . . . The District Court here properly concluded that an incorrect constitutional standard had been applied by the state court in determining the issue of waiver. . . .

. . . . .

"[T]his court recently held that an accused can voluntarily, knowingly and intelligently waive his right to have counsel present at an interrogation after counsel has been appointed. . . . The prosecution, however, has the weighty obligation to show that the waiver was knowingly and intelligently made. We quite agree with Judge Hanson that the state here failed to so show." 509 F. 2d, at 233.

The District Court and the Court of Appeals were correct in the view that the question of waiver was not a question of historical fact, but one which, in the words of Mr. Justice Frankfurter, requires "application of constitutional principles to the facts as found . . . ." *Brown* v. *Allen,* 344 U. S. 443,

507 (separate opinion). See *Townsend* v. *Sain,* 372 U. S., at 309 n. 6, 318; *Brookhart* v. *Janis;* 384 U. S. 1, 4.

The District Court and the Court of Appeals were also correct in their understanding of the proper standard to be applied in determining the question of waiver as a matter of federal constitutional law—that it was incumbent upon the State to prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson* v. *Zerbst,* 304 U. S., at 464. That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant, *Carnley* v. *Cochran,* 369 U. S. 506, 513; cf. *Miranda* v. *Arizona,* 384 U. S., at 471, and that courts indulge in every reasonable presumption against waiver, *e. g., Brookhart* v. *Janis, supra,* at 4; *Glasser* v. *United States,* 315 U. S. 60, 70. This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings. *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 238–240; *United States* v. *Wade,* 388 U. S., at 237.

We conclude, finally, that the Court of Appeals was correct in holding that, judged by these standards, the record in this case falls far short of sustaining petitioner's burden. It is true that Williams had been informed of and appeared to understand his right to counsel. But waiver requires not merely comprehension but relinquishment, and Williams' consistent reliance upon the advice of counsel in dealing with the authorities refutes any suggestion that he waived that right. He consulted McKnight by long-distance telephone before turning himself in. He spoke with McKnight by telephone again shortly after being booked. After he was arraigned, Williams sought out and obtained legal advice from Kelly. Williams again consulted with Kelly after Detective Leaming and his fellow officer arrived in Davenport. Throughout, Williams was advised not to make any statements before seeing McKnight in Des Moines, and was

assured that the police had agreed not to question him. His statements while in the car that he would tell the whole story *after* seeing McKnight in Des Moines were the clearest expressions by Williams himself that he desired the presence of an attorney before any interrogation took place. But even before making these statements, Williams had effectively asserted his right to counsel by having secured attorneys at both ends of the automobile trip, both of whom, acting as his agents, had made clear to the police that no interrogation was to occur during the journey. Williams knew of that agreement and, particularly in view of his consistent reliance on counsel, there is no basis for concluding that he disavowed it.[10]

Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to the assistance of counsel.

The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and

---

[10] Cf. *Michigan* v. *Mosley,* 423 U. S. 96, 110 n. 2 (WHITE, J., concurring in result):

"[T]he reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism."

Fourteenth Amendments.[11]  It only held, as do we, that he did not.

## IV

The crime of which Williams was convicted was senseless and brutal, calling for swift and energetic action by the police to apprehend the perpetrator and gather evidence with which he could be convicted.  No mission of law enforcement officials is more important.  Yet "[d]isinterested zeal for the public good does not assure either wisdom or right in the methods it pursues."  *Haley* v. *Ohio,* 332 U. S. 596, 605 (Frankfurter, J., concurring in judgment).  Although we do not lightly affirm the issuance of a writ of habeas corpus in this case, so clear a violation of the Sixth and Fourteenth Amendments as here occurred cannot be condoned.  The pressures on state executive and judicial officers charged with the administration of the criminal law are great, especially when the crime is murder and the victim a small child.  But it is precisely the predictability of those pressures that makes imperative a resolute loyalty to the guarantees that the Constitution extends to us all.

The judgment of the Court of Appeals is affirmed.[12]

*It is so ordered.*[13]

Mr. Justice Marshall, concurring.

I concur wholeheartedly in my Brother Stewart's opinion for the Court, but add these words in light of the dissenting

---

[11] Compare, *e. g., United States* v. *Springer,* 460 F. 2d 1344, 1350 (CA7); *Wilson* v. *United States,* 398 F. 2d 331 (CA5); *Coughlan* v. *United States,* 391 F. 2d 371 (CA9), with, *e. g., United States* v. *Thomas,* 474 F. 2d 110, 112 (CA10); *United States* v. *Springer, supra,* at 1354–1355 (Stevens, J., dissenting); *United States ex rel. Magoon* v. *Reincke,* 416 F. 2d 69 (CA2), aff'g 304 F. Supp. 1014 (Conn.).  Cf. *United States* v. *Pheaster,* 544 F. 2d 353 (CA9).

[12] The District Court stated that its decision "does not touch upon the issue of what evidence, if any, beyond the incriminating statements them-

opinions filed today. The dissenters have, I believe, lost sight of the fundamental constitutional backbone of our criminal law. They seem to think that Detective Leaming's actions were perfectly proper, indeed laudable, examples of "good police work." In my view, good police work is something far different from catching the criminal at any price. It is equally important that the police, as guardians of the law, fulfill their responsibility to obey its commands scrupulously. For "in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano* v. *New York,* 360 U. S. 315, 320–321 (1959).

In this case, there can be no doubt that Detective Leaming consciously and knowingly set out to violate Williams' Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination, as Leaming himself understood those rights. Leaming knew that Williams had been advised

---

selves must be excluded as 'fruit of the poisonous tree.' " 375 F. Supp. 170, 185. We, too, have no occasion to address this issue, and in the present posture of the case there is no basis for the view of our dissenting Brethren, *post,* at 430 (WHITE, J.) ; *post,* at 441 (BLACKMUN, J.), that any attempt to retry the respondent would probably be futile. While neither Williams' incriminating statements themselves nor any testimony describing his having led the police to the victim's body can constitutionally be admitted into evidence, evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams. Cf. *Killough* v. *United States,* 119 U. S. App. D. C. 10, 336 F. 2d 929. In the event that a retrial is instituted, it will be for the state courts in the first instance to determine whether particular items of evidence may be admitted.

[13] The Court of Appeals suspended the issuance of the writ of habeas corpus for 60 days to allow an opportunity for a new trial, and further suspended its issuance pending disposition of the petition for a writ of certiorari in this Court. In affirming the judgment of the Court of Appeals, we further suspend the issuance of the writ of release from custody for 60 days from this date to allow the State of Iowa an opportunity to initiate a new trial, and judgment will be entered accordingly.

by two lawyers not to make any statements to police until he conferred in Des Moines with his attorney there, Mr. McKnight. Leaming surely understood, because he had overheard McKnight tell Williams as much, that the location of the body would be revealed to police. Undoubtedly Leaming realized the way in which that information would be conveyed to the police: McKnight would learn it from his client and then he would lead police to the body. Williams would thereby be protected by the attorney-client privilege from incriminating himself by directly demonstrating his knowledge of the body's location, and the unfortunate Powers child could be given a "Christian burial."

Of course, this scenario would accomplish all that Leaming sought from his investigation except that it would not produce incriminating statements or actions from Williams. Accordingly, Leaming undertook his charade to pry such evidence from Williams. After invoking the no-passengers rule to prevent attorney Kelly from accompanying the prisoner, Leaming had Williams at his mercy: during the three- or four-hour trip he could do anything he wished to elicit a confession. The detective demonstrated once again "that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.' " *Blackburn* v. *Alabama*, 361 U. S. 199, 206 (1960).

Leaming knowingly isolated Williams from the protection of his lawyers and during that period he intentionally "persuaded" him to give incriminating evidence. It is this intentional police misconduct—not good police practice—that the Court rightly condemns. The heinous nature of the crime is no excuse, as the dissenters would have it, for condoning knowing and intentional police transgression of the constitutional rights of a defendant. If Williams is to go free—and given the ingenuity of Iowa prosecutors on retrial or in a civil commitment proceeding, I doubt very much that there is any chance a dangerous criminal will be loosed on the streets, the

bloodcurdling cries of the dissents notwithstanding—it will hardly be because he deserves it. It will be because Detective Leaming, knowing full well that he risked reversal of Williams' conviction, intentionally denied Williams the right of *every* American under the Sixth Amendment to have the protective shield of a lawyer between himself and the awesome power of the State.

I think it appropriate here to recall not Mr. Justice Cardozo's opinion in *People* v. *Defore,* 242 N. Y. 13, 150 N. E. 585 (1926), see opinion of THE CHIEF JUSTICE, *post,* at 416, and n. 1, but rather the closing words of Mr. Justice Brandeis' great dissent in *Olmstead* v. *United States,* 277 U. S. 438, 471, 485 (1928):

> "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

MR. JUSTICE POWELL, concurring.

As the dissenting opinion of THE CHIEF JUSTICE sharply illustrates, resolution of the issues in this case turns primarily on one's perception of the facts. There is little difference of opinion, among the several courts and numerous judges who have reviewed the case, as to the relevant constitutional principles: (i) Williams had the right to assistance of coun-

sel; (ii) once that right attached (it is conceded that it had in this case), the State could not properly interrogate Williams in the absence of counsel unless he voluntarily and knowingly waived the right; and (iii) the burden was on the State to show that Williams in fact had waived the right before the police interrogated him.

The critical factual issue is whether there had been a voluntary waiver, and this turns in large part upon whether there was interrogation. As my dissenting Brothers view the facts so differently from my own perception of them, I will repeat briefly the background, setting, and factual predicate to the incriminating statements by Williams—even though the opinion of the Court sets forth all of this quite accurately.

## I

Prior to the automobile trip from Davenport to Des Moines, Williams had been arrested, booked, and carefully given *Miranda* warnings. It is settled constitutional doctrine that he then had the right to the assistance of counsel. His exercise of this right was evidenced uniquely in this case. Williams had consulted counsel prior to his arrest, and surrendered to the police on advice of counsel. At all times thereafter Williams, to the knowledge of the police, had two attorneys: McKnight, whom Williams consulted initially and who awaited his arrival in Des Moines, and Kelly, who had represented Williams in Davenport where he surrendered. Significantly, the recognition by the police of the status of counsel was evidenced by the *express agreement* between McKnight and the appropriate police officials that the officers who would drive Williams to Des Moines would not interrogate him in the absence of counsel.

The incriminating statements were made by Williams during the long ride while in the custody of two police officers, and in the absence of his retained counsel. The dissent of THE

CHIEF JUSTICE concludes that prior to these statements, Williams had "made a valid waiver" of his right to have counsel present. *Post,* at 417. This view disregards the record evidence clearly indicating that the police engaged in interrogation of Williams. For example, the District Court noted:

"According to Detective Leaming's own testimony, the specific purpose of this conversation [which was initiated by Leaming and which preceded Williams' confession] was to obtain statements and information from [Williams] concerning the missing girl." 375 F. Supp. 170, 174.

In support of that finding, the District Court quoted extensively from Leaming's testimony, including the following:

"Q. In fact, Captain, whether [Williams] was a mental patient or not, you were trying to get all the information you could before he got to his lawyer, weren't you?

"A. I was sure hoping to find out where that little girl was, yes, sir.

.        .        .        .        .

"Q. Well, I'll put it this way: You were hoping to get all the information you could before Williams got back to McKnight, weren't you?

"A. Yes, sir." *Ibid.*

After finding, upon a full review of the facts, that there had been "interrogation," the District Court addressed the ultimate issue of "waiver" and concluded not only that the State had failed to carry its burden but also that

"there is *nothing* in the record to indicate that [Williams] waived his Fifth and Sixth Amendment rights *except* the fact that statements eventually were obtained." *Id.,* at 182. (Emphasis in original.)

The Court of Appeals stated affirmatively that "the facts

as found by the District Court had substantial basis in the record." 509 F. 2d 227, 231.[1]

I join the opinion of the Court which also finds that the efforts of Detective Leaming "to elicit information from Williams," as conceded by counsel for petitioner at oral argument, *ante,* at 400 n. 6, were a skillful and effective form of interrogation. Moreover, the entire setting was conducive to the psychological coercion that was successfully exploited. Williams was known by the police to be a young man with quixotic religious convictions and a history of mental disorders. The date was the day after Christmas, the weather was ominous, and the setting appropriate for Detective Leaming's talk of snow concealing the body and preventing a "Christian burial." Williams was alone in the automobile with two police officers for several hours. It is clear from the record, as both of the federal courts below found, that there was no evidence of a knowing and voluntary waiver of the right to have counsel present beyond the fact that Williams ultimately confessed. It is settled law that an inferred waiver of a constitutional right is disfavored. *Estelle* v. *Williams,* 425 U. S. 501, 515 (1976) (POWELL, J., concurring). I find no basis in the record of this case—or in the dissenting opin-

---

[1] Before concluding that the police had engaged in interrogation, the District Court summarized the factual background:

"Detective Leaming obtained statements from Petitioner in the absence of counsel (1) after making, and then breaking, an agreement with Mr. McKnight that Petitioner would not be questioned until he arrived in Des Moines and saw Mr. McKnight; (2) after being told by both Mr. McKnight and Mr. Kelly that Petitioner was not to be questioned until he reached Des Moines; (3) after refusing to allow Mr. Kelly, whom Detective Leaming himself regarded as Petitioner's co-counsel, to ride to Des Moines with Petitioner; and (4) after being told by Petitioner that he would talk *after* he reached Des Moines and Mr. McKnight. By violating or ignoring these several, clear indications that Petitioner was to have counsel during interrogation, Detective Leaming deprived Petitioner of his right to counsel in a way similar to, if not more objectionable than, that utilized against the defendant in *Massiah* [v. *United States,* 377 U. S. 201 (1964)]." 375 F. Supp., at 177 (footnote omitted).

ions—for disagreeing with the conclusion of the District Court that "the State has produced no affirmative evidence whatsoever to support its claim of waiver." 375 F. Supp., at 183.

The dissenting opinion of THE CHIEF JUSTICE states that the Court's holding today "conclusively presumes a suspect is legally incompetent to change his mind and tell the truth until an attorney is present." *Post,* at 419. I find no justification for this view. On the contrary, the opinion of the Court is explicitly clear that the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel. *Ante,* at 405–406. We would have such a case here if petitioner had proved that the police officers refrained from coercion and interrogation, as they had agreed, and that Williams freely on his own initiative had confessed the crime.

## II

In discussing the exclusionary rule, the dissenting opinion of THE CHIEF JUSTICE refers to *Stone* v. *Powell,* 428 U. S. 465 (1976), decided last Term. In that case, we held that a federal court need not apply the exclusionary rule on habeas corpus review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review.

This case also involves review on habeas corpus of a state conviction, and the decisions that the Court today affirms held that Williams' incriminating statements should have been excluded.[2] As *Stone* was decided subsequently to these

---

[2] I tend generally to share the view that the *per se* application of an exclusionary rule has little to commend it except ease of application. All too often applying the rule in this fashion results in freeing the guilty without any offsetting enhancement of the rights of all citizens. Moreover, rigid adherence to the exclusionary rule in many circumstances imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes. *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 267 (1973) (POWELL, J., concurring). I therefore have indicated, at least with respect to Fourth Amendment violations,

decisions, the courts below had no occasion to consider whether the principle enunciated in *Stone* may have been applicable in this case. That question has not been presented in the briefs or arguments submitted to us,[3] and we therefore have no occasion to consider the possible applicability of *Stone*. The applicability of the rationale of *Stone* in the Fifth and Sixth Amendment context raises a number of unresolved issues. Many Fifth and Sixth Amendment claims arise in the context of challenges to the fairness of a trial or to the integrity of the factfinding process. In contrast, Fourth Amendment claims uniformly involve evidence that is "typically reliable and often the most probative information bearing on the guilt or innocence of the defendant." *Stone v. Powell, supra,* at 490. Whether the rationale of *Stone* should be applied to those Fifth and Sixth Amendment claims or classes of claims that more closely parallel claims under the Fourth Amendment is a question as to which I intimate no view, and which should be resolved only after the implications of such a ruling have been fully explored.

Mr. Justice Stevens, concurring.

Mr. Justice Stewart, in his opinion for the Court which I join, Mr. Justice Powell, and Mr. Justice Marshall have

that a distinction should be made between flagrant violations by the police, on the one hand, and technical, trivial, or inadvertent violations, on the other. *Brown v. Illinois,* 422 U. S. 590, 610–612 (1975) (concurring opinion). Here, we have a Sixth Amendment case and also one in which the police deliberately took advantage of an inherently coercive setting in the absence of counsel, contrary to their express agreement. Police are to be commended for diligent efforts to ascertain the truth, but the police conduct in this case plainly violated respondent's constitutional rights.

[3] The *Stone* issue was not mentioned in any of the briefs, including petitioner's reply brief filed September 29, 1976—some three months after our decision in *Stone* was announced. The possible relevance of *Stone* was raised by a question from the bench during oral argument. This prompted brief comments by counsel for both parties. Tr. of Oral Arg., 26–27, 49–50. But in no meaningful sense can the issue be viewed as having been "argued" in this case.

accurately explained the reasons why the law requires the result we reach today. Nevertheless, the strong language in the dissenting opinions prompts me to add this brief comment about the Court's function in a case such as this.

Nothing that we write, no matter how well reasoned or forcefully expressed, can bring back the victim of this tragedy or undo the consequences of the official neglect which led to the respondent's escape from a state mental institution. The emotional aspects of the case make it difficult to decide dispassionately, but do not qualify our obligation to apply the law with an eye to the future as well as with concern for the result in the particular case before us.

Underlying the surface issues in this case is the question whether a fugitive from justice can rely on his lawyer's advice given in connection with a decision to surrender voluntarily. The defendant placed his trust in an experienced Iowa trial lawyer who in turn trusted the Iowa law enforcement authorities to honor a commitment made during negotiations which led to the apprehension of a potentially dangerous person. Under any analysis, this was a critical stage of the proceeding in which the participation of an independent professional was of vital importance to the accused and to society. At this stage—as in countless others in which the law profoundly affects the life of the individual—the lawyer is the essential medium through which the demands and commitments of the sovereign are communicated to the citizen. If, in the long run, we are seriously concerned about the individual's effective representation by counsel, the State cannot be permitted to dishonor its promise to this lawyer.*

MR. CHIEF JUSTICE BURGER, dissenting.

The result in this case ought to be intolerable in any society which purports to call itself an organized society. It con-

---

*The importance of this point is emphasized by the State's refusal to permit counsel to accompany his client on the trip from Davenport to Des Moines.

tinues the Court—by the narrowest margin—on the much-criticized course of punishing the public for the mistakes and misdeeds of law enforcement officers, instead of punishing the officer directly, if in fact he is guilty of wrongdoing. It mechanically and blindly keeps reliable evidence from juries whether the claimed constitutional violation involves gross police misconduct or honest human error.

Williams is guilty of the savage murder of a small child; no member of the Court contends he is not. While in custody, and after no fewer than *five* warnings of his rights to silence and to counsel, he led police to the concealed body of his victim. The Court concedes Williams was not threatened or coerced and that he spoke and acted voluntarily and with full awareness of his constitutional rights. In the face of all this, the Court now holds that because Williams was prompted by the detective's statement—not interrogation but a statement—the jury must not be told how the police found the body.

Today's holding fulfills Judge (later Mr. Justice) Cardozo's grim prophecy that someday some court might carry the exclusionary rule to the absurd extent that its operative effect would exclude evidence relating to the body of a murder victim because of the means by which it was found.[1] In so ruling

---

[1] "The criminal is to go free because the constable has blundered. . . . A room is searched against the law, and the body of a murdered man is found. . . . The privacy of the home has been infringed, and the murderer goes free." *People* v. *Defore*, 242 N. Y. 13, 21, 23–24, 150 N. E. 585, 587, 588 (1926).

The Court protests, *ante*, at 407 n. 12, that its holding excludes only "Williams' incriminating statements themselves [as well as] any testimony describing his having led the police to the victim's body," thus hinting that successful retrial of this palpably guilty felon is realistically possible. Even if this were all, and the *corpus delicti* could be used to establish the fact and manner of the victim's death, the Court's holding clearly bars all efforts to let the jury know how the police found the body. But the Court's further—and remarkable—statement that "evidence of where the body was found and of its condition" could be admitted *only* "on the theory that the body would have been discovered in any event" makes

the Court regresses to playing a grisly game of "hide and seek," once more exalting the sporting theory of criminal justice which has been experiencing a decline in our jurisprudence. With JUSTICES WHITE, BLACKMUN, and REHNQUIST, I categorically reject the remarkable notion that the police in this case were guilty of unconstitutional misconduct, or any conduct justifying the bizarre result reached by the Court. Apart from a brief comment on the merits, however, I wish to focus on the irrationality of applying the increasingly discredited exclusionary rule to this case.

## (1)

### *The Court Concedes Williams' Disclosures Were Voluntary*

Under well-settled precedents which the Court freely acknowledges, it is very clear that Williams had made a valid waiver of his Fifth Amendment right to silence and his Sixth Amendment right to counsel when he led police to the child's body. Indeed, even under the Court's analysis I do not understand how a contrary conclusion is possible.

The Court purports to apply as the appropriate constitutional waiver standard the familiar "intentional relinquishment or abandonment of a known right or privilege" test of *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). *Ante*, at 404. The Court assumes, without deciding, that Williams' conduct and statements were voluntary. It concedes, as it must, *ibid.*, that Williams had been informed of and fully understood his constitutional rights and the consequences of their waiver. Then, having either assumed or found every element necessary to make out a valid waiver under its own test, the

---

clear that the Court is determined to keep the truth from the jurors pledged to find the truth. If all use of the *corpus delicti* is to be barred by the Court as "fruit of the poisonous tree" under *Wong Sun* v. *United States*, 371 U. S. 471 (1963), except on the unlikely theory suggested by the Court, the Court renders the prospects of doing justice in this case exceedingly remote.

Court reaches the astonishing conclusion that no valid waiver has been demonstrated.

This remarkable result is compounded by the Court's failure to define what evidentiary showing the State failed to make. Only recently, in *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 238 n. 25 (1973), the Court analyzed the distinction between a voluntary act and the waiver of a right; there MR. JUSTICE STEWART stated for the Court:

> "[T]he question whether a person has acted 'voluntarily' is quite distinct from the question whether he has 'waived' a trial right. The former question, as we made clear in *Brady* v. *United States,* 397 U. S. [742,] 749, can be answered only by examining all the relevant circumstances to determine if he has been coerced. The latter question turns on the extent of his knowledge."

Similarly, in *McMann* v. *Richardson,* 397 U. S. 759, 766 (1970), we said that since a guilty plea constituted a waiver of a host of constitutional rights, "it must be an intelligent act 'done with sufficient awareness of the relevant circumstances and likely consequences.' " If the Court today applied these standards with fidelity to the *Schneckloth* and *McMann* holdings it could not reach the result now announced.

The evidence is uncontradicted that Williams had abundant knowledge of his right to have counsel present and of his right to silence. Since the Court does not question his mental competence, it boggles the mind to suggest that Williams could not understand that leading police to the child's body would have other than the most serious consequences. All of the elements necessary to make out a valid waiver are shown by the record and acknowledged by the Court; we thus are left to guess how the Court reached its holding.

One plausible but unarticulated basis for the result reached is that once a suspect has asserted his right not to talk without the presence of an attorney, it becomes legally impossible

for him to waive that right until he has seen an attorney. But constitutional rights are *personal,* and an otherwise valid waiver should not be brushed aside by judges simply because an attorney was not present. The Court's holding operates to "imprison a man in his privileges," *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 280 (1942); it conclusively presumes a suspect is legally incompetent to change his mind and tell the truth until an attorney is present. It denigrates an individual to a nonperson whose free will has become hostage to a lawyer so that until the lawyer consents, the suspect is deprived of any legal right or power to decide for himself that he wishes to make a disclosure. It denies that the rights to counsel and silence are personal, nondelegable, and subject to a waiver only by that individual.[2] The opinions in support of the Court's judgment do not enlighten us as to why police conduct—whether good or bad—should operate to suspend Williams' right to change his mind and "tell all" at once rather than waiting until he reached Des Moines.[3]

In his concurring opinion Mr. Justice Powell suggests that the result in this case turns on whether Detective Leaming's remarks constituted "interrogation," as he views them, or whether they were "statements" intended to prick the conscience of the accused. I find it most remarkable that a murder case should turn on judicial interpretation that a statement becomes a question simply because it is followed by an

[2] Such a paternalistic rule is particularly anomalous in the Sixth Amendment context, where this Court has only recently discovered an independent constitutional right of self-representation, allowing an accused the absolute right to proceed without a lawyer at trial, once he is aware of the consequences. *Faretta* v. *California,* 422 U. S. 806 (1975).

[3] Paradoxically, in light of the result reached, the Court acknowledges that Williams repeatedly stated: "When I get to Des Moines and see Mr. McKnight, I am going to tell you the whole story." Read in context it is plain that Williams was saying he intended to confess. The Court then goes on to hold, in effect, that Williams could not change his mind until he reached Des Moines.

incriminating disclosure from the suspect. The Court seems to be saying that since Williams said he would "tell the whole story" at Des Moines, the police should have been content and waited; of course, that would have been the wiser course, especially in light of the nuances of constitutional jurisprudence applied by the Court, but a murder case ought not turn on such tenuous strands.

In any case, the Court assures us, *ante*, at 405–406, this is not at all what it intends, and that a valid waiver was *possible* in these circumstances, but was not quite made. Here, of course, Williams did not confess to the murder in so many words; it was his conduct in guiding police to the body, not his words, which incriminated him. And the record is replete with evidence that Williams knew precisely what he was doing when he guided police to the body. The human urge to confess wrongdoing is, of course, normal in all save hardened, professional criminals, as psychiatrists and analysts have demonstrated. T. Reik, The Compulsion to Confess (1972).

## (2)

### *The Exclusionary Rule Should Not be Applied to Non-egregious Police Conduct*

Even if there was no waiver, and assuming a technical violation occurred, the Court errs gravely in mechanically applying the exclusionary rule without considering whether that Draconian judicial doctrine should be invoked in these circumstances, or indeed whether any of its conceivable goals will be furthered by its application here.

The obvious flaws of the exclusionary rule as a judicial remedy are familiar. See *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 411 (1971) (BURGER, C. J., dissenting); *Stone* v. *Powell,* 428 U. S. 465, 498–502 (1976) (BURGER, C. J., concurring); Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665 (1970); Williams, The Exclusionary Rule Under Foreign Law—Eng-

land, 52 J. Crim. L. 272 (1961). Today's holding interrupts what has been a more rational perception of the constitutional and social utility of excluding reliable evidence from the truth-seeking process. In its Fourth Amendment context, we have now recognized that the exclusionary rule is in no sense a *personal* constitutional right, but a judicially conceived remedial device designed to safeguard and effectuate guaranteed legal rights generally. *Stone* v. *Powell, supra,* at 482; *United States* v. *Janis,* 428 U. S. 433, 443–447 (1976); *United States* v. *Calandra,* 414 U. S. 338, 347–348 (1974); see *Alderman* v. *United States,* 394 U. S. 165, 174–175 (1969). We have repeatedly emphasized that deterrence of unconstitutional or otherwise unlawful police conduct is the only valid justification for excluding reliable and probative evidence from the criminal factfinding process. *Stone* v. *Powell, supra,* at 485–486; *United States* v. *Janis, supra,* at 446, 458–459, n. 35; *United States* v. *Peltier,* 422 U. S. 531, 536–539 (1975).

Accordingly, unlawfully obtained evidence is not automatically excluded from the factfinding process in all circumstances.[4] In a variety of contexts we inquire whether ap-

---

[4] One familiar example of this Court's unwillingness to apply the prophylactic exclusionary rule beyond its natural scope is the requirement that evidence seized in violation of the rights of another person may not be challenged by a defendant whose own rights were not invaded. *Alderman* v. *United States,* 394 U. S. 165, 174–175 (1969).

Another is the rule that the "taint" of a constitutional violation may be vitiated by later events so that evidence which would not have been obtained but for the constitutional violation may yet be admissible. *Wong Sun* v. *United States,* 371 U. S. 471 (1963); see *Brown* v. *Illinois,* 422 U. S. 590 (1975).

Both these limitations on the use of the exclusionary rule are inconsistent with its deterrent rationale. If courts wished to enhance the deterrent effect on law enforcement officers, all evidence whose seizure could be traced directly to any constitutional violation would be suppressed. It is evident that our refusal to expand the rule in this fashion represents a considered balancing between "the additional benefits of extending the exclusionary rule" and "the public interest in prosecuting those ac-

plication of the rule will promote its objectives sufficiently to justify the enormous cost it imposes on society. "As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States* v. *Calandra, supra,* at 348; accord, *Stone* v. *Powell, supra,* at 486–491; *United States* v. *Janis, supra; Brown* v. *Illinois,* 422 U. S. 590, 606, 608–609 (1975) (POWELL, J., concurring in part); *United States* v. *Peltier, supra,* at 538–539.

This is, of course, the familiar balancing process applicable to cases in which important competing interests are at stake. It is a recognition, albeit belated, that "the policies behind the exclusionary rule are not absolute," *Stone* v. *Powell, supra,* at 488. It acknowledges that so serious an infringement of the crucial truth-seeking function of a criminal prosecution should be allowed only when imperative to safeguard constitutional rights. An important factor in this amalgam is whether the violation at issue may properly be classed as "egregious." *Brown* v. *Illinois, supra,* at 609 (POWELL, J., concurring in part). The Court understandably does not try to characterize the police actions here as "egregious."

Against this background, it is striking that the Court fails even to consider whether the benefits secured by application of the exclusionary rule in this case outweigh its obvious social costs. Perhaps the failure is due to the fact that this case arises not under the Fourth Amendment, but under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and the Sixth Amendment right to counsel. The Court apparently perceives the function of the exclusionary rule to be so different in these varying contexts that it must be mechanically and uncriti-

---

cused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman* v. *United States, supra,* at 175; see *United States* v. *Calandra,* 414 U. S. 338, 348 (1974).

cally applied in all cases arising outside the Fourth Amendment.[5]

But this is demonstrably not the case where police conduct collides with *Miranda*'s procedural safeguards rather than with the Fifth Amendment privilege against compulsory self-incrimination. Involuntary and coerced admissions are suppressed because of the inherent unreliability of a confession wrung from an unwilling suspect by threats, brutality, or other coercion. *Schneckloth* v. *Bustamonte,* 412 U. S., at 242; *Linkletter* v. *Walker,* 381 U. S. 618, 638 (1965); *Stone* v. *Powell,* 428 U. S., at 496–497 (BURGER, C. J., concurring); *Kaufman* v. *United States,* 394 U. S. 217, 237 (1969) (Black, J., dissenting). We can all agree on " '[t]he abhorrence of society to the use of involuntary confessions,' " *Linkletter* v. *Walker, supra,* at 638, and the need to preserve the integrity of the human personality and individual free will. *Ibid.;* *Blackburn* v. *Alabama,* 361 U. S. 199, 206–207 (1960).

But use of Williams' disclosures and their fruits carries no risk whatever of unreliability, for the body was found where he said it would be found. Moreover, since the Court makes no issue of voluntariness, no dangers are posed to individual dignity or free will. *Miranda*'s safeguards are premised on presumed unreliability long associated with confessions extorted by brutality or threats; they are not personal constitutional rights, but are simply judicially created prophylactic measures. *Michigan* v. *Tucker,* 417 U. S. 433 (1974); *Doyle*

---

[5] Indeed, if this were a Fourth Amendment case our course would be clear; only last Term, in *Stone* v. *Powell,* we held that application of the exclusionary rule in federal habeas corpus has such a minimal deterrent effect on law enforcement officials that habeas relief should not be granted on the ground that unconstitutionally seized evidence was introduced at trial. Since the quantum of deterrence provided by federal habeas does not vary with the constitutional provision at issue, it appears that the Court sees fundamental, though unarticulated, differences in the exclusionary sanction when it is applied in other contexts.

v. *Ohio,* 426 U. S. 610, 617 (1976) ; *Brown* v. *Illinois, supra,* at 606 (POWELL, J., concurring in part).

Thus, in cases where incriminating disclosures are voluntarily made without coercion, and hence not violative of the Fifth Amendment, but are obtained in violation of one of the *Miranda* prophylaxes, suppression is no longer automatic. Rather, we weigh the deterrent effect on unlawful police conduct, together with the normative Fifth Amendment justifications for suppression, against "the strong interest under any system of justice of making available to the trier of fact all concededly relevant and trustworthy evidence which either party seeks to adduce. . . . We also 'must consider society's interest in the effective prosecution of criminals . . . .' " *Michigan* v. *Tucker, supra,* at 450.[6] This individualized consideration or balancing process with respect to the exclusionary sanction is possible in this case, as in others, because ,Williams' incriminating disclosures are not infected with any element of compulsion the Fifth Amendment forbids; nor, as noted earlier, does this evidence pose any danger of unreliability to the factfinding process. In short, there is no reason to exclude this evidence.

Similarly, the exclusionary rule is not uniformly implicated in the Sixth Amendment, particularly its pretrial aspects. We have held that

> "the core purpose of the counsel guarantee was to assure 'Assistance' at trial, when the accused was confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States* v. *Ash,* 413 U. S. 300, 309 (1973).

Thus, the right to counsel is fundamentally a "trial" right necessitated by the legal complexities of a criminal prosecu-

---

[6] Statements obtained in violation of *Miranda* have long been used for impeachment purposes. *Oregon* v. *Hass,* 420 U. S. 714 (1975); *Harris* v. *New York,* 401 U. S. 222 (1971). See also *Walder* v. *United States,* 347 U. S. 62 (1954).

tion and the need to offset, to the trier of fact, the power of the State as prosecutor. See *Schneckloth* v. *Bustamonte, supra,* at 241. It is now thought that modern law enforcement involves pretrial confrontations at which the defendant's fate might effectively be sealed before the right of counsel could attach. In order to make meaningful the defendant's opportunity to a fair trial and to assistance of counsel at that trial—the core purposes of the counsel guarantee—the Court formulated a *per se* rule guaranteeing counsel at what it has characterized as "critical" pretrial proceedings where substantial rights might be endangered. *United States* v. *Wade,* 388 U. S. 218, 224–227 (1967); *Schneckloth* v. *Bustamonte, supra,* at 238–239.

As we have seen in the Fifth Amendment setting, violations of prophylactic rules designed to safeguard other constitutional guarantees and deter impermissible police conduct need not call for the automatic suppression of evidence without regard to the purposes served by exclusion; nor do Fourth Amendment violations merit uncritical suppression of evidence. In other situations we decline to suppress eyewitness identifications which are the products of unnecessarily suggestive lineups or photo. displays unless there is a "very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U. S. 377, 384 (1968). Recognizing that "[i]t is the likelihood of misidentification which violates a defendant's right to due process," *Neil* v. *Biggers,* 409 U. S. 188, 198 (1972), we exclude evidence only when essential to safeguard the integrity of the truth-seeking process. The test, in short, is the reliability of the evidence.

So, too, in the Sixth Amendment sphere failure to have counsel in a pretrial setting should not lead to the "knee-jerk" suppression of relevant and reliable evidence. Just as even uncounseled "critical" pretrial confrontations may often be conducted fairly and not in derogation of Sixth Amendment values, *Stovall* v. *Denno,* 388 U. S. 293, 298–299 (1967), evi-

dence obtained in such proceedings should be suppressed only when its use would imperil the core values the Amendment was written to protect. Having extended Sixth Amendment concepts originally thought to relate to the trial itself to earlier periods when a criminal investigation is focused on a suspect, application of the drastic bar of exclusion should be approached with caution.

In any event, the fundamental purpose of the Sixth Amendment is to safeguard the fairness of the trial and the integrity of the factfinding process.[7] In this case, where the evidence of how the child's body was found is of unquestioned reliability, and since the Court accepts Williams' disclosures as voluntary and uncoerced, there is no issue either of fairness or evidentiary reliability to justify suppression of truth. It appears suppression is mandated here for no other reason than the Court's general impression that it may have a beneficial effect on future police conduct; indeed, the Court fails to say even that much in defense of its holding.

Thus, whether considered under *Miranda* or the Sixth Amendment, there is no more reason to exclude the evidence in this case than there was in *Stone* v. *Powell;*[8] that holding was

---

[7] Indeed, we determine whether pretrial proceedings are "critical" by asking whether counsel is there needed to protect the fairness of the trial. See *United States* v. *Ash,* 413 U. S. 300, 322 (1973) (STEWART, J., concurring); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 239 (1973). It is also clear that the danger of factual error was the moving force behind the counsel guarantee in such cases as *United States* v. *Wade,* 388 U. S. 218 (1967) (post-indictment lineups).

[8] This is a far cry from *Massiah* v. *United States,* 377 U. S. 201 (1964). Massiah's statements had no independent indicia of reliability as do respondent's. Moreover, Massiah was unaware that he was being interrogated by ruse and had not been advised of his right to counsel.

Here, as MR. JUSTICE BLACKMUN has noted, there was no interrogation of Williams in the sense that term was used in *Massiah, Escobedo* v. *Illinois,* 378 U. S. 478 (1964), or *Miranda.* That the detective's statement appealed to Williams' conscience is not a sufficient reason to equate it to a police station grilling. It could well be that merely driving on the road

premised on the utter reliability of evidence sought to be suppressed, the irrelevancy of the constitutional claim to the criminal defendant's factual guilt or innocence, and the minimal deterrent effect of habeas corpus on police misconduct. This case, like *Stone* v. *Powell,* comes to us by way of habeas corpus after a fair trial and appeal in the state courts. Relevant factors in this case are thus indistinguishable from those in *Stone,* and from those in other Fourth Amendment cases suggesting a balancing approach toward utilization of the exclusionary sanction. Rather than adopting a formalistic analysis varying with the constitutional provision invoked,[9] we should apply the exclusionary rule on the basis of its benefits and costs, at least in those cases where the police conduct at issue is far from being outrageous or egregious.

In his opinion, MR. JUSTICE POWELL intimates that he agrees there is little sense in applying the exclusionary sanction where the evidence suppressed is " 'typically reliable and often the most probative information bearing on the guilt or innocence of the defendant.' " *Ante,* at 414. Since he seems to concede that the evidence in question is highly reliable and probative, his joining the Court's opinion can be explained only by an insistence that the "question has not been presented in the briefs or arguments submitted to us." *Ibid.* But petitioner has directly challenged the applicability of the exclusionary rule to this case, Brief for Petitioner 31–32, and has invoked principles of comity and federalism against reversal of the conviction. *Id.,* at 69–73. Moreover, at oral argument—the first opportunity to do so—petitioner argued

and passing the intersection where he had turned off to bury the body might have produced the same result without any suggestive comments.

[9] Clearly there will be many cases where evidence obtained in violation of right-to-counsel rules is inadmissible, either for reasons related to the normative purposes of the Sixth Amendment or to the deterrence of unlawful police conduct. But this is, on the Court's facts, not such a case, and it hardly furthers reasoned analysis to lump it into an undifferentiated conceptual category for reasons which do not apply to it.

that our intervening decision in *Stone* v. *Powell* should be extended to this case, just as respondent argued that it should not. Tr. of Oral Arg. 26–27, 49–50.

At the least, if our intervening decision in *Stone* makes application of the exclusionary rule in this case an open question which "should be resolved only after the implications of such a ruling have been fully explored," the plainly proper course is to vacate the judgment of the Court of Appeals and remand the case for reconsideration in light of that case. Indeed, only recently we actually applied the intervening decision of *Washington* v. *Davis,* 426 U. S. 229 (1976), to resolve the constitutional issue in *Arlington Heights* v. *Metropolitan Housing Dev. Corp.;* 429 U. S. 252 (1977). There, we found no difficulty in applying the intervening holding ourselves without a remand to give the Court of Appeals an opportunity to reconsider its holding; we reached the correct result directly, over MR. JUSTICE WHITE's dissent urging a remand. Today, the Court declines either to apply the intervening case of *Stone* v. *Powell,* which MR. JUSTICE POWELL admits may well be controlling, or to remand for reconsideration in light of that case; this is all the more surprising since MR. JUSTICE POWELL wrote *Stone* v. *Powell* and today makes the fifth vote for the Court's judgment.

The bizarre result reached by the Court today recalls Mr. Justice Black's strong dissent in *Kaufman* v. *United States,* 394 U. S., at 231. There, too, a defendant sought release after his conviction had been affirmed on appeal. There, as here, the defendant's guilt was manifest, and was not called into question by the constitutional claims presented. This Court granted relief because it thought reliable evidence had been unconstitutionally obtained. Mr. Justice Black's reaction, foreshadowing our long overdue holding in *Stone* v. *Powell,* serves as a fitting conclusion to the views I have expressed:

> "It is seemingly becoming more and more difficult to gain acceptance for the proposition that punishment of

the guilty is desirable, other things being equal. One commentator, who attempted in vain to dissuade this Court from today's holding, thought it necessary to point out that there is 'a strong public interest in convicting the guilty.' . . .

". . . I would not let any criminal conviction become invulnerable to collateral attack where there is left remaining the probability or possibility that constitutional commands related to the integrity of the fact-finding process have been violated. In such situations society has failed to perform its obligation to prove beyond a reasonable doubt that the defendant committed the crime. But it is quite a different thing to permit collateral attack on a conviction after a trial according to due process when the defendant clearly is, by the proof and by his own admission, guilty of the crime charged. . . . In collateral attacks whether by habeas corpus or by § 2255 proceedings, I would always require that the convicted defendant raise the kind of constitutional claim that casts some shadow of a doubt on his guilt. This defendant is permitted to attack his conviction collaterally although he conceded at the trial and does not now deny that he had robbed the savings and loan association and although the evidence makes absolutely clear that he knew what he was doing. Thus, his guilt being certain, surely he does not have a constitutional right to get a new trial. I cannot possibly agree with the Court." 394 U. S., at 240–242.

Like Mr. Justice Black in *Kaufman,* I cannot possibly agree with the Court.

Mr. Justice White, with whom Mr. Justice Blackmun and Mr. Justice Rehnquist join, dissenting.

The respondent in this case killed a 10-year-old child. The majority sets aside his conviction, holding that certain

statements of unquestioned reliability were unconstitutionally obtained from him, and under the circumstances probably makes it impossible to retry him. Because there is nothing in the Constitution or in our previous cases which requires the Court's action, I dissent.

## I

The victim in this case disappeared from a YMCA building in Des Moines, Iowa, on Christmas Eve in 1968. Respondent was seen shortly thereafter carrying a bundle wrapped in a blanket from the YMCA to his car. His car was found in Davenport, Iowa, 160 miles away on Christmas Day. A warrant was then issued for his arrest. On the day after Christmas respondent surrendered himself voluntarily to local police in Davenport where he was arraigned. The Des Moines police, in turn, drove to Davenport, picked respondent up and drove him back to Des Moines. During the trip back to Des Moines respondent made statements evidencing his knowledge of the whereabouts of the victim's clothing and body and leading the police to the body. The statements were, of course, made without the presence of counsel since no counsel was in the police car. The issue in this case is whether respondent—who was entitled not to make any statements to the police without consultation with and/or presence of counsel [1]—validly waived those rights.

The relevant facts are as follows. Before the Des Moines police officers arrived in Davenport, respondent was twice advised, once by Davenport police and once by a judge, of his right to counsel under *Miranda* v. *Arizona,* 384 U. S.

---

[1] It does not matter whether the right not to make statements in the absence of counsel stems from *Massiah* v. *United States,* 377 U. S. 201 (1964), or *Miranda* v. *Arizona,* 384 U. S. 436 (1966). In either case the question is one of waiver. Waiver was not addressed in *Massiah* because there the statements were being made to an informant and the defendant had no way of knowing that he had a right not to talk to him without counsel.

436 (1966). Respondent had in any event not only retained counsel prior to the arrival of the Des Moines police, but had consulted with that counsel on the subject of talking to the police. His attorney, Mr. McKnight, spoke with him from the Des Moines police office when respondent was in the Davenport police office. He advised respondent not to talk to the Des Moines police officers during the trip back to Des Moines, but told him that he was "going to have to tell the officers where she [the victim] is" when he arrived in Des Moines. Respondent also consulted with a lawyer in Davenport, who also advised him against talking to the police during the ride back to Des Moines. Thus, prior to the arrival of the Des Moines police, respondent had been effectively informed by at least four people that he need not talk to the police in the absence of counsel during his trip to Des Moines. Then, when the Des Moines police arrived, one of them advised respondent, *inter alia,* "that he had a right to an attorney present during any questioning." The Des Moines police officer asked respondent: "[D]o you fully understand that?" Respondent said that he did. The officer then "advised him that [the officer] wanted him to be sure to remember what [the officer] had just told him because it was a long ride back to Des Moines and he and [the officer] would be visiting." Respondent then consulted again with the Davenport attorney, who advised him not to make any statements to the police officers and so informed the officers—directing them not to question him. After this series of warnings by two attorneys, two sets of police officers, and a judge, the trip to Des Moines commenced.

Sometime early in the trip one of the officers, Detective Leaming, said:

"I want to give you something to think about while we're traveling down the road. . . . Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visi-

432

bility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all."

Respondent asked Detective Leaming why he thought their route to Des Moines would be taking them past the girl's body, and Leaming responded that he knew the body was in the area of Mitchellville—a town they would be passing on the way to Des Moines. Leaming then stated: "I do not want you to answer me. I don't want to discuss it any further. Just think about it as we're riding down the road." On several occasions during the trip, respondent told the officers that he would tell them the whole story when he got to Des Moines and saw Mr. McKnight—an indication that he knew he was entitled to wait until his counsel was present before talking to the police.[2]

---

[2] The record does not make it crystal clear that these statements, or some of them, *followed* the above-quoted statements by Detective Leaming. However, the record reveals that Leaming's statement was made not long after leaving Davenport and that respondent's statement that he would tell the whole story when they arrived in Des Moines was made "several times." It is reasonable to infer that respondent's statement followed that by Leaming. During some of the rest of the trip respondent asked questions of the officers about the investigation, about how they would treat him, and about a number of subjects unrelated to the case.

Some considerable time thereafter,[3] without any prompting on the part of any state official so far as the record reveals, respondent asked whether the police had found the victim's shoes. The subject of the victim's clothing had never been broached by the police nor suggested by anything the police had said. So far as the record reveals, the subject was suggested to respondent solely by the fact that the police car was then about to pass the gas station where respondent had hidden the shoes. When the police said they were unsure whether they had found the shoes, respondent directed them to the gas station. When the car continued on its way to Des Moines, responded asked whether the blanket had been found. Once again this subject had not previously been broached. Respondent directed the officers to a rest area where he had left the blanket. When the car again continued, respondent said that he would direct the officers to the victim's body, and he did so.

## II

The strictest test of waiver which might be applied to this case is that set forth in *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938), and quoted by the majority, *ante,* at 404. In order to show that a right has been waived under this test, the State must prove "an intentional relinquishment or abandonment of a known right or privilege." The majority creates no new rule preventing an accused who has retained a lawyer from waiving his right to the lawyer's presence during questioning. The majority simply finds that no waiver was *proved* in this case. I disagree. That respondent knew of his right not to say anything to the officers without advice and presence of counsel is established on this record to a moral

---

[3] The trip was 160 miles long and was made in bad weather. Leaming's statement was made shortly after leaving Davenport. Respondent's statements about the victim's clothes were made shortly before arriving in Mitchellville, a near suburb of Des Moines.

certainty. He was advised of the right by three officials of the State—telling at least one that he understood the right— and by two lawyers.[4] Finally, he further demonstrated his knowledge of the right by informing the police that he would tell them the story in the presence of McKnight when they arrived in Des Moines. The issue in this case, then, is whether respondent relinquished that right intentionally.

Respondent relinquished his right not to talk to the police about his crime when the car approached the place where he had hidden the victim's clothes. Men usually intend to do what they do, and there is nothing in the record to support the proposition that respondent's decision to talk was anything but an exercise of his own free will. Apparently, without any prodding from the officers, respondent—who had earlier said that he would tell the whole story when he arrived in Des Moines—spontaneously changed his mind about the timing of his disclosures when the car approached the places where he had hidden the evidence. However, even if his statements were influenced by Detective Leaming's above-quoted statement, respondent's decision to talk in the absence of counsel can hardly be viewed as the product of an overborne will. The statement by Leaming was not coercive; it was accompanied by a request that respondent not respond to it; and it was delivered hours before respondent decided to make any statement. Respondent's waiver was thus knowing and intentional.

The majority's contrary conclusion seems to rest on the fact that respondent "asserted" his right to counsel by retaining and consulting with one lawyer and by consulting with another. How this supports the conclusion that respondent's later relinquishment of his right not to talk in the

---

[4] Moreover, he in fact received advice of counsel on at least two occasions on the question whether he should talk to the police on the trip to Des Moines.

absence of counsel was unintentional is a mystery. The fact that respondent consulted with counsel on the question whether he should talk to the police in counsel's absence makes his later decision to talk in counsel's absence *better* informed and, if anything, more intelligent.

The majority recognizes that even after this "assertion" of his right to counsel, it would have found that respondent waived his right not to talk in counsel's absence if his waiver had been express—*i. e.,* if the officers had asked him in the car whether he would be willing to answer questions in counsel's absence and if he had answered "yes." *Ante,* at 405. But waiver is not a formalistic concept. Waiver is shown whenever the facts establish that an accused knew of a right and intended to relinquish it. Such waiver, even if not express,[5] was plainly shown here. The only other con-

---

[5] The Courts of Appeals, in administering the rule of *Miranda* v. *Arizona,* have not required an express waiver of the rights to silence and to counsel which an accused must be advised about under that case. Waiver has been found where the accused is informed of those rights, understands them, and then proceeds voluntarily to answer questions in the absence of counsel. *United States* v. *Marchildon,* 519 F. 2d 337, 343 (CA8 1975) ("Waiver depends on no form of words, written or oral. It is to be determined from all of the surrounding circumstances. Addressing ourselves to this issue we held in *Hughes* v. *Swenson,* 452 F. 2d 866, 867–868 (CA8 1971), that: 'The thrust of appellant's claim is that a valid waiver cannot be effective absent an expressed declaration to that effect. We are cited to no case which supports appellant's thesis and independent research discloses none. To the contrary, the Fifth, Seventh, Ninth, and Tenth Circuits have held in effect that if the defendant is effectively advised of his rights and intelligently and understandingly declines to exercise them, the waiver is valid' "); *United States* v. *Ganter,* 436 F. 2d 364, 370 (CA7 1970) ("[A]n express statement that the individual does not want a lawyer is not required if it appears that the defendant was effectively advised of his rights and he then intelligently and understandingly declined to exercise them"); *United States* v. *James,* 528 F. 2d 999, 1019 (CA5 1976) (" 'All that the prosecution must show is that the defendant was effectively advised of his rights and that he then intelligently and understandingly declined to exercise them' "); *Blackmon* v. *Blackledge,*

ceivable basis for the majority's holding is the implicit suggestion, *ante,* at 400–401, that the right involved in *Massiah* v. *United States,* 377 U. S. 201 (1964), as distinguished from the right involved in *Miranda* v. *Arizona,* 384 U. S. 436 (1966), is a right not to be *asked* any questions in counsel's absence rather than a right not to *answer* any questions in counsel's absence, and that the right not to be *asked* questions must be waived *before* the questions are asked. Such wafer-thin distinctions cannot determine whether a guilty murderer should go free. The only conceivable purpose for the presence of counsel during questioning is to protect an accused from making incriminating *answers.* Questions, unanswered, have no significance at all. Absent coercion [6]—no matter how the

---

541 F. 2d 1070, 1072 (CA4 1976) ("[H]e was reasonably questioned only after having been fully informed of his rights and permitted to make a telephone call. Under such circumstances, a suspect's submission to questioning without objection and without requesting a lawyer is clearly a waiver of his right to counsel, if, indeed, he understands his rights"); *United States* v. *Boston,* 508 F. 2d 1171 (CA2 1974); *United States* v. *Johnson,* 466 F. 2d 1206 (CA8 1972); *Mitchell* v. *United States,* 140 U. S. App. D. C. 209, 434 F. 2d 483 (1970); *Bond* v. *United States,* 397 F. 2d 162 (CA10 1968).

There is absolutely no reason to require an additional question to the already cumbersome *Miranda* litany just because the majority finds another case—*Massiah* v. *United States*—providing exactly the same right to counsel as that involved in *Miranda.* In either event, the issue is, as the majority recognizes, one of the proof necessary to establish waiver. If an intentional relinquishment of the right to counsel under *Miranda* is established by proof that the accused was informed of his right and then voluntarily answered questions in counsel's absence, then similar proof establishes an intentional relinquishment of the *Massiah* right to counsel.

[6] There is a rigid prophylactic rule set forth in *Miranda* v. *Arizona* that once an arrestee requests presence of counsel at questioning, *questioning* must cease. The rule depends on an indication by the *accused* that he will be unable to handle the decision whether or not to answer questions without advice of counsel, see *Michigan* v. *Mosley,* 423 U. S. 96, 110 n. 2 (1975) (WHITE, J., concurring), and is inapplicable to this case

right involved is defined—an accused is amply protected by a rule requiring waiver before or simultaneously with the giving by him of an answer or the making by him of a statement.

## III

The consequence of the majority's decision is, as the majority recognizes, extremely serious. A mentally disturbed killer whose guilt is not in question may be released. Why? Apparently the answer is that the majority believes that the law enforcement officers acted in a way which involves some risk of injury to society and that such conduct should be deterred. However, the officers' conduct did not, and was not likely to, jeopardize the fairness of respondent's trial or in any way risk the conviction of an innocent man—the risk against which the Sixth Amendment guarantee of assistance of counsel is designed to protect. *Powell* v. *Alabama*, 287 U. S. 45 (1932); *Johnson* v. *Zerbst*, 304 U. S. 458 (1938); *Hamilton* v. *Alabama*, 368 U. S. 52 (1961); *Gideon* v. *Wainwright*, 372 U. S. 335 (1963); *White* v. *Maryland*, 373 U. S. 59 (1963); *United States* v. *Wade*, 388 U. S. 218 (1967); *Gilbert* v. *California*, 388 U. S. 263 (1967); *Coleman* v. *Alabama*, 399 U. S. 1

for two reasons. First, at no time did *respondent* indicate a desire not to be asked questions outside the presence of his counsel—notwithstanding the fact that he was told that he and the officers would be "visiting in the car." The majority concludes, although studiously avoiding reliance on *Miranda*, that respondent *asserted* his right to counsel. This he did in some respects, but he never, himself, asserted a right not to be questioned in the absence of counsel. Second, as is noted in the dissenting opinion of MR. JUSTICE BLACKMUN, respondent was not questioned. The rigid prophylactic rule—as the majority implicitly recognizes—is designed solely to prevent involuntary waivers of the right against self-incrimination and is not to be applied to a statement by a law enforcement officer accompanied by a request by the officer that the accused make no response followed by more than an hour of silence and an apparently spontaneous statement on a subject—the victim's shoes—not broached in the "speech." Under such circumstances there is not even a small risk that the waiver will be involuntary.

(1970); and *Argersinger* v. *Hamlin,* 407 U. S. 25 (1972). But see *Massiah* v. *United States, supra.* The police did nothing "wrong," let alone anything "unconstitutional." To anyone not lost in the intricacies of the prophylactic rules of *Miranda* v. *Arizona,* the result in this case seems utterly senseless; and for the reasons stated in Part II, *supra,* even applying those rules as well as the rule of *Massiah* v. *United States, supra,* the statements made by respondent were properly admitted. In light of these considerations, the majority's protest that the result in this case is justified by a "clear violation" of the Sixth and Fourteenth Amendments has a distressing hollow ring. I respectfully dissent.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST join, dissenting.

The State of Iowa, and 21 States and others, as *amici curiae,* strongly urge that this Court's procedural (as distinguished from constitutional) ruling in *Miranda* v. *Arizona,* 384 U. S. 436 (1966), be re-examined and overruled. I, however, agree with the Court, *ante,* at 397, that this is not now the case in which that issue need be considered.

What the Court chooses to do here, and with which I disagree, is to hold that respondent Williams' situation was in the mold of *Massiah* v. *United States,* 377 U. S. 201 (1964), that is, that it was dominated by a denial to Williams of his Sixth Amendment right to counsel after criminal proceedings had been instituted against him. The Court rules that the Sixth Amendment was violated because Detective Leaming "purposely sought during Williams' isolation from his lawyers to obtain as much incriminating information as possible." *Ante,* at 399, and POWELL, J., concurring, *ante,* at 410–413. I cannot regard that as unconstitutional *per se.*

First, the police did not deliberately seek to isolate Williams from his lawyers so as to deprive him of the

assistance of counsel. Cf. *Escobedo* v. *Illinois,* 378 U. S. 478 (1964). The isolation in this case was a necessary incident of transporting Williams to the county where the crime was committed.[1]

Second, Leaming's purpose was not solely to obtain incriminating evidence. The victim had been missing for only two days, and the police could not be certain that she was dead. Leaming, of course, and in accord with his duty, was "hoping to find out where that little girl was," *ante,* at 399, but such motivation does not equate with an intention to evade the Sixth Amendment.[2] Moreover, the Court seems to me to place an undue emphasis, *ante,* at 392, 400, and aspersion on what it and the lower courts have chosen to call the "Christian burial speech," and on Williams' "deeply religious" convictions.

Third, not every attempt to elicit information should be regarded as "tantamount to interrogation," *ante,* at 400. I am not persuaded that Leaming's observations and comments, made as the police car traversed the snowy and slippery miles between Davenport and Des Moines that winter afternoon, were an interrogation, direct or subtle, of Williams. Contrary to this Court's statement, *ibid.,* the Iowa Supreme Court appears to me to have thought and held otherwise, *State* v. *Williams,* 182 N. W. 2d 396, 403–405 (1970), and I agree. Williams, after all, was counseled by lawyers, and warned by the arraigning judge in Davenport and by the

---

[1] Neither attorney McKnight nor attorney Kelly objected to Williams' being returned to Des Moines, although each sought assurance that he would not be interrogated. That "the entire setting was conducive to . . . psychological coercion," POWELL, J., concurring, *ante,* at 412, was more attributable to Williams' flight from Des Moines than to any machinations of the police. Surely the police are not to be blamed for the facts that the murder was committed on Christmas Eve and that the weather was ominous.

[2] Indeed, Williams already had promised Leaming that he would tell "the whole story" when he reached Des Moines. *Ante,* at 392.

police, and yet it was he who started the travel conversations and brought up the subject of the criminal investigation. Without further reviewing the circumstances of the trip, I would say it is clear there was no interrogation. In this respect, I am in full accord with Judge Webster in his vigorous dissent, 509 F. 2d 227, 234–237, and with the views implicitly indicated by Chief Judge Gibson and Judge Stephenson, who joined him in voting for rehearing en banc.

In summary, it seems to me that the Court is holding that *Massiah* is violated whenever police engage in any conduct, in the absence of counsel, with the subjective desire to obtain information from a suspect after arraignment. Such a rule is far too broad. Persons in custody frequently volunteer statements in response to stimuli other than interrogation. See, *e. g., United States* v. *Cook,* 530 F. 2d 145, 152–153 (CA7), cert. denied, 426 U. S. 909 (1976) (defendant engaged officers in conversation while being transported to magistrate); *United States* v. *Martin,* 511 F. 2d 148, 150–151 (CA8 1975) (agent initiated conversation with suspect, provoking damaging admission); *United States* v. *Menichino,* 497 F. 2d 935, 939–941 (CA5 1974) (incriminating statements volunteered during booking process); *Haire* v. *Sarver,* 437 F. 2d 1262 (CA8), cert. denied, 404 U. S. 910 (1971) (statements volunteered in response to questioning of defendant's wife). When there is no interrogation, such statements should be admissible as long as they are truly voluntary.[3]

The *Massiah* point thus being of no consequence, I would vacate the judgment of the Court of Appeals and remand

---

[3] With all deference to the Court, I do not agree that *Massiah* regarded it as "constitutionally irrelevant" that the statements in that case were surreptitiously obtained, *ante,* at 400. The *Massiah* opinion quoted with approval the dissenting Circuit Judge's statement that "Massiah was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent." 377 U. S., at 206.

the case for consideration of the issue of voluntariness, in the constitutional sense, of Williams' statements, an issue the Court of Appeals did not reach when the case was before it.

One final word: I can understand the discomfiture the Court obviously suffers and expresses in Part IV of its opinion, *ante,* at 406, and the like discomfiture expressed by Justice (now United States District Judge) Stuart of the Iowa court in the dissent he felt compelled to make by this Court's precedents, 182 N. W. 2d, at 406. This was a brutal, tragic, and heinous crime inflicted upon a young girl on the afternoon of the day before Christmas. With the exclusionary rule operating as the Court effectuates it, the decision today probably means that, as a practical matter, no new trial will be possible at this date eight years after the crime, and that this respondent necessarily will go free. That, of course, is not the standard by which a case of this kind strictly is to be judged. But, as Judge Webster in dissent below observed, 509 F. 2d, at 237, placing the case in sensible and proper perspective: "The evidence of Williams' guilt was overwhelming. No challenge is made to the reliability of the fact-finding process." I am in full agreement with that observation.