**GOVERNMENT OF the CANAL ZONE,
Plaintiff-Appellee,**

v.

**Samuel Gene PEACH,
Defendant-Appellant.**

**No. 78–5414.**

United States Court of Appeals,
Fifth Circuit.

Sept. 10, 1979.

Arthur J. O'Donnell, Chicago, Ill., Daniel D. Douglas, Balboa, Canal Zone, for plaintiff-appellee.

Frank J. Violanti, U. S. Atty., William H. Beatty, Asst. U. S. Atty., Balboa, Canal Zone, Mervyn Hamburg, U. S. Dept. of Justice, Washington, D. C., for defendant-appellant.

Before SIMPSON, TJOFLAT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

Samuel Gene Peach appeals his conviction for the first degree murder of Ruby Gutierrez. He contends that a confession introduced at trial was obtained from him in violation of his right to counsel under the sixth amendment and rule 44 of the Federal Rules of Criminal Procedure. Finding no reversible error in the proceedings below, we affirm the conviction.

## I

During the early evening hours of December 29, 1977, Bertha Rubiella (Ruby)

Gutierrez, a 21-year-old Panamanian maid, was brutally beaten and stabbed to death in the Canal Zone residence of her employer, Gary Anderson. The Andersons were all away from home at the time. Anderson discovered the body when he returned to his house at 8:45 p. m. He called the Canal Zone police; the police pathologist determined the time of death to be approximately 7:00 p. m.

The police soon commenced interviewing friends and acquaintances of the Anderson family and of the deceased in an effort to develop leads. One of the more than 40 persons interviewed was the appellant, Peach, a 19-year-old soldier stationed at Fort Kobbe, Canal Zone, who had dated Anderson's 14-year-old daughter, Carrie. Peach was first interviewed on January 5, 1978, when he responded to a request to come to the Balboa police station for questioning. Detectives Don Ruby and Mel Attkinson conducted the interview, during which Peach affirmed that he knew Carrie Anderson and admitted having sexual intercourse with her on one occasion six months earlier. When asked to account for his activities on December 29, Peach said that he had gone to the Anderson residence at about 6:30 p. m. on that day, but, upon being told by the maid that Carrie was not there, he had left.

Up to this point, Peach had not been given the warnings set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but he had been told that he did not have to answer any questions, and, by his own admission, felt free to leave the stationhouse at any time. At the close of this first phase of the interview, he was read his rights, and, since he indicated that he did not totally understand them, they were explained to him in detail. He then said that he understood them; he gave no indication that he wished to consult an attorney.

The questioning resumed briefly prior to a break for lunch and continued afterwards for a short time until Peach asked to see a chaplain. One of the detectives drove him back to his barracks, and Peach agreed to be available for questioning the next day. After his return to the barracks, Peach went to see a friend, PFC Donald Jeeninga. Peach confessed to Jeeninga that he had raped the maid who worked for the parents of his girlfriend and had then killed her because she would recognize him if he ever returned to the Anderson home. Peach gave Jeeninga some clothing and asked him to dispose of it.

Peach next went to see a very close friend, Sgt. Robert Perry, at his home and asked to talk with him privately. Peach again confessed to the murder. Perry urged Peach to turn himself in and said that if Peach did not do so by the following Monday, January 9, Perry would report their conversation. Peach said, "Okay." Record, vol. 5, at 132.

The next day, the detectives came to the barracks and asked Peach if he would return to the stationhouse for further questioning. Peach declined but said he would answer questions there on the base. He was asked if he recalled his rights as they had been explained the day before, and he said he did. He was questioned about the clothes he was wearing on December 29. He consented to a search of his room, during which the police seized some of his clothing. While at the barracks, the detectives met an Army Criminal Investigation Command Agent, Anthony Japuntich. The police asked Japuntich's aid in obtaining photographs and fingerprints of Peach since they were afraid he might flee. Japuntich cleared this request with Peach's commanding officer, and the group went to the agent's headquarters at Albrook Air Station where Peach was photographed and fingerprinted. While alone with Japuntich in the latter's office, Peach asked if he was entitled to an army lawyer. Japuntich called the army legal office and was told that if Peach were arrested by the civilian authorities, the army probably would not represent him, but Japuntich was given the names of some military lawyers to contact directly. Japuntich attempted, unsuccessfully, to call them, after which he gave the list of names and phone numbers to Peach.

Peach and Japuntich then left the office and walked to the waiting room where they rejoined the detectives. Japuntich could not recall whether he told the police officers about his conversation with Peach, but he testified that Peach had never asked for a lawyer and Japuntich did not tell the detectives that he had. The detectives had been in touch with their superior in the interim, and, soon after Peach walked into the room, they arrested him for the statutory rape of Carrie Anderson. They advised Peach of his rights, then took him to the Canal Zone jail where he was booked, again given full *Miranda* warnings, and placed in a cell. A phone was available for his use, but Peach made no attempt to contact either a military or civilian lawyer.

The next day, Saturday, January 7, Peach was brought before the Balboa magistrate for his initial appearance pursuant to Fed. R.Crim.P. 5. There is no transcript of this hearing, but the testimony at the suppression hearing and the magistrate's brief report of proceedings indicate the following sequence of events. Peach appeared in person, unrepresented by counsel. The statutory rape complaint was read to him, and Peach was informed of his rights, including the right to retain counsel of his choice or to have an attorney appointed for him if he could not afford one. Peach stated he understood the charge against him and his rights as they had been explained. There followed a colloquy between Peach and the magistrate regarding Peach's financial ability to employ an attorney. The magistrate was evidently of the opinion that since Peach was employed by the Army he was not indigent and did not need appointed counsel. Peach said nothing to counteract this impression, and one witness testified that Peach indicated he would take care of obtaining counsel. Acting on instructions from the magistrate, Detective Attkinson obtained a list of Canal Zone attorneys for Peach to contact, and this list was given to Peach at the hearing. At no time did Peach request or indicate to the magistrate that he wanted an attorney appointed.

Peach was returned to his cell and the officer on duty was instructed that Peach could call his family, friends, or an attorney, but Peach made no attempt to contact anyone. About two hours after the hearing, Detective Attkinson came to Peach's cell and asked him if he had retained an attorney. Peach said no. He was then escorted to an interrogation room where he agreed to answer questions after hearing his rights read to him again. After about 40 minutes of questioning about the statutory rape and his whereabouts on the day of the murder, Peach said he would tell the police what they wanted to know but first he wanted to talk to his friend Sgt. Perry.

Perry came to the police station and talked with Peach alone for about fifteen minutes. During this discussion Peach said he was ready to come clean with the police. The two men may also have discussed the possibility of obtaining a lawyer for Peach, but the court found that this discussion, if it occurred, was never communicated to the police. Two detectives then reentered the room, and in Perry's presence again read the *Miranda* warnings. Peach then gave a disjointed oral statement of his activities on December 29, 1977, including the killing of Ruby Gutierrez. Following this statement, he agreed to go with the police to the Anderson home to reenact the crime. He also took the police to the place where he had thrown the murder weapon into the canal. Perry was not permitted to come along on this trip. After returning to the police station, Peach dictated a confession to a police stenographer, read the typed statement twice, and signed it. The confession states in the first paragraph, "I understand my rights. I do not want a lawyer present at this time." Government Exh. 18.

Peach had his initial appearance before the magistrate on the murder charge the next day, January 8. He did not request an attorney and none was appointed for him. At the continuation of this hearing on January 12, 1978, the public defender was appointed to represent Peach at the request of the United States Attorney when Peach said he was unable to retain his own counsel because he was paying off outstanding bills.

An information was filed against Peach on February 3, 1978. Following a jury trial, he was found guilty and sentenced to life imprisonment. His sole claim on this appeal is that the district court erred in failing to suppress his confession.

## II

Peach does not contend that he was denied any rights due him under *Miranda v. Arizona*. Rather, he argues that he had a sixth amendment right to counsel under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and that he never waived that right in the manner required by *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). We agree that Peach had a right to the assistance of counsel beginning at least with his first appearance before the magistrate on January 7, but we think that the district court's finding that he waived that right must be upheld.

There can be no doubt that Peach understood his right to retain counsel or have counsel appointed for him. He had an eleventh grade education, and he was given *Miranda* warnings seven times before he confessed to the police. On the one occasion that he said he did not completely understand his rights they were explained to him in detail. He never once indicated to the authorities a desire to exercise his right to counsel. The court below and the parties to this appeal agree that the January 7 hearing is critical in this regard. At that time he was advised of his right to have an attorney for the fifth time, and the question whether he could afford to retain one was raised. Peach did not assert that he was indigent and did not request that counsel be appointed to represent him. If he intended at that time to retain his own counsel, the police did everything they can reasonably be expected to have done to facilitate that end. Peach was given a list of attorneys to contact and given access to a phone, but he made no effort to call any of them.

The written statement that was introduced at trial plainly states, "I do not want a lawyer present at this time." The testimony indicates that these were not Peach's words; they are part of a standard government introduction to confessions. Nevertheless, Peach carefully read the statement twice before signing it and testified that he understood at the time that he was giving up his right to have an attorney present. Record, vol. 3, at 101. This is not a case like *Brewer v. Williams* where the police were aware that the defendant was represented by counsel and deliberately set out to get a confession before he could consult his attorney. Peach's actions and words, as disclosed by this record, fully support the district court's finding of waiver.

## III

The second argument on this appeal is that the federal magistrate violated Fed. R.Crim.P. 44 when he failed to appoint counsel for Peach at the January 7 hearing. Rule 44(a) states: "Every defendant who is unable to obtain counsel shall be entitled to have counsel assigned to represent him at every stage of the proceedings from his initial appearance before the federal magistrate or the court through appeal, unless he waives such appointment." The Advisory Committee notes to the rule state that it is "intended to require the assignment of counsel as promptly as possible after it appears that the defendant is unable to obtain counsel." 18 U.S.C. Federal Rules of Criminal Procedure App. at 1471 (1976). As we have stated, at the hearing Peach was advised for the fifth time of his right to retain counsel or to have an attorney appointed to represent him if he could not afford to obtain one himself. The magistrate conducted an inquiry regarding whether Peach could afford a lawyer. The evidence clearly preponderates in favor of the view that Peach failed to give any indication to the magistrate either that he could not afford an attorney or that he wanted one appointed. Under these circumstances, we do not think the rule required that anything more be done. At no time during this hearing did it "appear[ ] that the defendant [was] unable to obtain counsel." *Id*. What we

said in *De La Fe v. United States*, 413 F.2d 543, 544 (5th Cir. 1969), accurately describes our view of the rule: "The burden of furnishing an attorney only attaches upon representation of an individual that he is indigent and that he wishes an attorney."[1] *Cf. United States v. Williams*, 544 F.2d 1215, 1218–19 (4th Cir. 1976) (waiver of statutory right to two counsel in capital case presumed absent request or clear necessity for additional counsel).

Peach cites *Carnley v. Cochran*, 369 U.S. 506, 513, 82 S.Ct. 884, 889, 8 L.Ed.2d 70 (1962), for the proposition that the right to be furnished counsel does not depend on a request. In *Carnley,* the defendant was never advised of his right to counsel, and the Supreme Court refused to imply waiver from a silent record. The record here is not silent. Peach was repeatedly advised of his rights, and we have already held that he waived his sixth amendment right to counsel before confessing. Under rule 44, once a defendant is advised of his right to have counsel appointed and an inquiry is made as to his ability to retain counsel, it is incumbent on the defendant to give some indication that he wants an attorney appointed for him. The authorities are not required to read his mind or discern that, although he says he will obtain an attorney, he really cannot afford one and should have appointed counsel. This is not a case where a defendant was required to plead or go to trial without the assistance of counsel. As soon as Peach indicated he could not afford an attorney, the magistrate appointed the public defender. The conviction is

AFFIRMED.

---

**1.** We do not suggest that indigency is the sole ground for appointing counsel. "If a defendant is able to compensate counsel but still cannot obtain counsel, he is entitled to the assignment of counsel even though not to free counsel." Advisory Comm. Notes to Rule 44(a), *supra.*

Peach gave no indication that he was unable to obtain counsel to represent him.