**Opinion filed March 3, 2011**



# In The

# Eleventh Court of Appeals

_____

## No. 11-09-00274-CR
_____

## MICHAEL MARTINEZ, JR., Appellant
## V.
## STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 17042B**

## O P I N I O N

Michael Martinez, Jr., appellant, was fifteen years old at the time of the offense but was certified to be tried as an adult. He was indicted for the murder of Eric McMahon, a homeless man who had been asleep in a dumpster in an alley near the Mission in Abilene. Two eyewitnesses watched appellant climb into the dumpster where he began stomping near the victim's head and then dropped a cinder block multiple times on the victim's head. The victim died from the blows. Another witness testified that appellant told him about kicking some dead guy in the head. A friend of appellant also testified that appellant had bragged that he killed someone with a brick or cinder block. Appellant's fingerprints were found on the dumpster. The jury found appellant guilty of murder as a principal or a party and assessed a ninety-nine year sentence. We affirm.

*Issues*

Appellant presents three issues on appeal: (1) did appellant knowingly, intelligently, and voluntarily waive his right to counsel; (2) should appellant's statement have been suppressed because the police violated Section 52.02 of the Texas Family Code; and (3) did the trial court err when it refused to adopt appellant's jury charge regarding appellant's statement.

*Background Facts*

Linda Venzor testified that she and Claude David Gilbert were collecting recyclable material on the night of October 26, 2008. Gilbert went to the dumpster, picked up a picture, and discovered the victim under the picture. Venzor said that they then went to a convenience store and called the police. After calling the police, they returned to the alley, parking about ten to fifteen feet away from the dumpster to wait for the police.

About fifteen minutes later, appellant and another boy came up to their van and asked them what they were doing. Gilbert told the boys that there was a man in the dumpster. The younger boy, appellant, went over and jumped into the dumpster. He then began jumping up and down on the man. Venzor then saw the older boy go behind the Mission, pick up a cinder block, and slam it down into the dumpster. Appellant picked up the block and started throwing it down on the victim. It did not appear to Venzor that appellant was forced to get in the dumpster or to throw the cinder block at the victim. According to Venzor, appellant was laughing while throwing the block down on the victim, appearing to think that his throwing the cinder block was funny. After seeing appellant throwing the cinder block at the victim repeatedly, and laughing, Venzor said that she and Gilbert left to get the police. When they returned, the police had arrived, but the two boys were gone. Venzor later identified appellant in a photo lineup.

Gilbert's testimony was similar to Venzor's. When he went to the dumpster looking for scrap metal, he saw a picture that someone he knew might use, and then he saw the victim's head. Gilbert was using a flashlight, and he shined the light in the victim's eyes. They were closed. Gilbert noted that there were no scratches on the victim's face. He and Venzor went to the convenience store to call the police. When they returned, there was no one else in the alley. About ten or fifteen minutes later, two Hispanic males came up to Gilbert's side of the van. Gilbert told them that he and Venzor were waiting for the police because of the body in the dumpster. The larger boy asked Gilbert if he had any "mota," but Gilbert did not know what that was. While the larger boy was talking to him, the smaller boy walked over to the dumpster and

2

got into it. Gilbert saw the larger boy pick up a cinder block and hand it to appellant, who then threw it down in the dumpster more than five times. The two boys appeared to take turns throwing the cinder block into the dumpster.

During cross-examination, Gilbert again identified appellant as the smaller boy who was in the dumpster. Gilbert did not recall the larger boy making any aggressive moves toward appellant. On redirect, Gilbert read from the statement he had given earlier:

> The younger of the two jumped up into the dumpster and then started jumping up and down into the spot where I'd seen the guy's head. He did this several times until the bigger guy handed him a cinder block, and he started to slam it down into the dumpster. I saw him do this at least three times before he left – before we left to find the cops.

James Henson, a paramedic with the City of Abilene, was the first EMS person to get in the dumpster to treat the victim. He testified that the victim was able to communicate with him in short comments and said his name was Eric. Henson described the victim's injuries and said the victim was bleeding heavily from the back of his head. They took him to Hendrick Medical Center; the victim was alive at that time.

Craig Jordan, a sergeant with the Abilene Police Department, testified that the victim was taken off life support while Sergeant Jordan was at the hospital. He showed pictures of defensive wounds on the inside of the victim's hands. He also testified that there was bruising above the kidneys that could be consistent with being kicked.

Clayton Daniels, an officer with the Abilene Police Department, testified as a forensic expert. After describing the items of evidence collected at the scene, including pieces of cinder block with blood, Officer Daniels testified that he obtained some latent fingerprints from around the top of the dumpster. He compared one latent fingerprint with appellant's and found eleven points of comparison. Based on the comparison points, it was his opinion that the print found on the front side of the dumpster belonged to appellant.

Detective Mike Hobbs, of the Abilene Police Department, was the police officer in charge of the case. When he arrived at the scene that night, the victim had already been transported to Hendrick Medical Center. On the following Monday, Detective Hobbs received a call from Herman Ussery who wanted to speak with a detective. Detective Hobbs took a statement from Ussery, and it was at that point that appellant appeared to be a suspect.

Ussery testified at trial that he had met appellant through Ron Deal, a friend of Ussery's. Ussery was at Deal's house the evening of October 26 and into the early morning of October 27. Appellant and his father were there, but the father subsequently left. Appellant left not long after his father left. When appellant returned around 1 a.m., Ussery said that appellant sat in a chair and remarked that "he had kicked a dead guy in the head" and then added "it was . . . in a dumpster." Ussery testified that it looked like appellant had been partying and drinking.

*Appellant's Statement.*

After Detective Hobbs received Ussery's call, he checked the computer records and found out that appellant was a juvenile. Because Detective Hobbs was not a juvenile officer, he contacted two officers with the Abilene Juvenile Division to help him with contacting and questioning appellant. David Varner was a police officer with the City of Abilene assigned to the juvenile section. Tony Golson was a detective with the Youth and Missing Persons Division.

Detective Hobbs went with Officer Varner and Detective Golson to appellant's school, the Travis Learning Center in Abilene. All three officers testified that appellant agreed to go with them to the Law Enforcement Center to answer questions. All three officers testified that appellant was not under arrest or handcuffed when he left school with them. Officer Varner testified that they were in an unmarked car and that appellant did not act nervous or agitated.

At the Juvenile Division in the Law Enforcement Center, appellant was fingerprinted for identification purposes. Officer Varner stated that the Texas Family Code authorizes officers to take a juvenile's fingerprints and photographs and that appellant had not been arrested. After getting additional information, such as appellant's date of birth, names of parents, and a telephone number for parental notification, Officer Varner read appellant his rights by reading Abilene's standard juvenile rights notification form and explaining its provisions. Appellant signed the form showing that he had been read his rights, and Officer Varner then introduced him to Detective Hobbs. Detective Hobbs interviewed appellant for fifteen to twenty minutes. Detective Hobbs testified that he explained that they were investigating a homicide, told appellant what they knew (Ussery's statement and the initial information from Venzor and Gilbert), and then asked appellant to tell them his side of the story. At the end of the interview, the officers asked appellant if he would give them a written statement. Appellant said that he would.

4

Detective Hobbs went with Officer Varner to Judge Bryan Smith's courtroom. Judge Smith testified that appellant was not handcuffed and that he did not seem to be nervous or upset. Only Judge Smith and appellant were in the room. Judge Smith identified in court the juvenile magistrate warning that he used with appellant. Judge Smith testified that he had read the warnings on the form word for word, pointing out to appellant that he had the right to have an attorney present to advise him before or during any questioning, the right to have an attorney appointed to counsel with him if appellant was unable to employ an attorney, and the right to stop the questioning at any time. Judge Smith testified that, if a juvenile refuses to sign the rights statement or does not understand the rights, he stops and takes the form back to the officer. According to Judge Smith, appellant's behavior was "kind of casual," and appellant signed the rights statement.

The officers and appellant returned to Detective Golson's office. Detective Hobbs and Detective Golson were with appellant when he gave his statement, and Detective Golson typed it. Detective Golson testified that appellant sat next to him and told him what happened and that Detective Golson typed the statement as appellant talked. It took about twenty minutes to type the statement. During that time, appellant did not ask to go to the bathroom and did not say that he wanted to leave or that he did not understand something. According to Detective Golson, there was no indication that appellant did not want to give the statement.

Detective Golson and Officer Varner then went with appellant to see Judge Smith a second time. Officer Varner testified that they took the Juvenile Statement (Notice of Rights) form and appellant's statement with the Magistrate Certification form for the judge to sign both forms and appellant, if he was still willing, to sign his statement. Again, the officers were not in the courtroom when Judge Smith was with appellant.

Judge Smith testified that he went through the rights form with appellant and had appellant read his statement. He said that he always asks, "Is this your statement? Is this true and correct? . . . Is this voluntary? . . . Did anybody threaten you [or] make you any promises?" According to Judge Smith, appellant seemed very calm and was willing to sign the statement. Judge Smith also said that he always reads the statement to see if there are any law enforcement phrases that a juvenile would not say in order to make certain that it is the juvenile's statement. After appellant signed the statement, Judge Smith asked him again if the statement was

5

voluntarily made without any threats or promises. Appellant did not seem hesitant about the statement in any way.

In his statement, appellant stated that his bike had a flat tire as he was going back to his house from the north side of town. He asked the people in the van for a ride, but they said they were waiting for the police because there was a dead body in the dumpster. Appellant stated that a Hispanic male about eighteen or older came up; appellant did not know him. Appellant then stated:

> I then climbed in the trash can and I kicked him a couple of times. I asked him if he was dead and he told me no and he pulled a board from over his head so that he could see me. That dude [the Hispanic male] asked him for his race and then this guy who I don't know said to "stomp on him." I then stomped on him several times. After that this dude that was standing outside of the trash can got a cinder block and threw it in the trash can and hit the guy in the head. This dude had brought a couple of cinder blocks up and hit the guy in the trash can with both of them. One of the cinder blocks broke and I picked up the broken piece and hit the guy in the head with it four or five times with the broken piece.

The entire process, from the time the officers contacted appellant at school until he signed his statement, took about two hours. After appellant signed his statement and the judge signed the rights form and magistrate's certification, the officers placed appellant under arrest and took him to the Juvenile Detention Center.

*Appellant's Trial Testimony.*

Appellant testified that, in October 2007, he and his dad were staying at Ron Deal's home; Deal was a friend of his dad's. On the evening of October 26, his dad was not there, and no one was supervising appellant. Appellant testified that he climbed out the window of the house, picked up his bicycle, and went toward South 3rd street. He met a fellow named Willow. Appellant did not know Willow but found out that he knew some of Willow's family.

Willow told appellant that there was a party on Shelton Street, and they went there. When asked how much beer he drank and how much weed he smoked, appellant answered, "Quite a bit." Appellant left the party by himself. Appellant said that, when he saw the back of a van in the alley, he decided to ask the driver of the van for a ride because his bicycle had a flat tire. He testified that he recognized Gilbert and Venzor as being the couple in the van that night.

Appellant said that Gilbert told him they were waiting for the police because there was a dead body in the dumpster closest to the van. Appellant agreed with Venzor's testimony that the

6

van was parked about fifteen feet from the dumpster. According to appellant, a person wearing a checkered shirt with a hood, which was over his head, had come up from behind him on the driver's side of the van. Appellant testified that they talked behind the van and that the guy's hands were in the pockets of his hoodie. Appellant said that he was curious so he went over to the dumpster and looked while the larger guy was talking to Gilbert. The guy then came over and told appellant to get into the dumpster, which he did. Appellant thought that the guy had a weapon; appellant claimed that he saw a gun after he was in the dumpster.

Appellant asked the victim if he was alive, and the victim pushed the board from his head. According to appellant, the hooded person asked the victim about his race. The hooded person told appellant to kick the victim, and appellant did. When he kicked the victim, the victim started curling up, and appellant started kicking him again in the head and back. The hooded person then tossed a brick in that hit the victim and split in half. He told appellant to pick up the brick and throw it. Appellant claimed that he saw a gun and that he was not laughing when he threw the cinder block at the victim. Appellant testified that he saw the van leave after the larger guy threw a second brick; appellant was still in the dumpster at the time.

During cross-examination, appellant was asked how the hooded person could hold the gun and throw the cinder block at the same time. Appellant said that he did not see the person throw the cinder block. Appellant admitted that the person never pointed the gun at him and that he had never mentioned the gun to anyone else. Appellant admitted again that he had thrown the cinder block at the victim after he kicked the victim.

Appellant said that he told his friend Candy (Candelario Rangel) the next day that he had killed somebody and that he said this to impress Candy. Appellant acknowledged that he was not in handcuffs when the police got him out of school but that he did not believe he could tell the police he did not want to go with them. Appellant remembered that Officer Varner and Detective Hobbs had given him the *Miranda*[1] warnings before they started talking to him, that he understood that he had a right to a lawyer, and that he had the right to not talk to anyone. Appellant said that the officers also told him that he had a right to have a lawyer and that, if he could not afford a lawyer, one could be appointed for him.

Appellant testified that he talked with his father right after he gave his statement. His father said that he was going to get a lawyer. Appellant stated again that his father showed up

---

[1]*Miranda v. Arizona*, 384 U.S. 436 (1966).

before he went to sign the statement in front of the judge. Appellant said that, when the judge asked him if he was willing to sign his statement, appellant signed it. He did not tell Judge Smith that he had just talked to his father who had told him not to do anything.

Appellant's counsel asked him why there was nothing in appellant's statement about the hooded person threatening him with a gun. Appellant said that he had not put that in the statement because he felt something might happen to him or to his family if he had.

*Appellant's Right to Counsel*

In appellant's first issue, he argues that his statement was not knowingly, intelligently, and voluntarily given because, when he was first taken before the magistrate, Judge Smith failed to explain how appellant could have counsel appointed. There are three steps in appellant's argument. First, he points out that, under Section 51.102 of the Family Code, the juvenile board in each county must adopt a plan for the appointment of counsel for indigents that, to the extent practicable, complies with the requirements of Article 26.04 of the Code of Criminal Procedure. TEX. FAM. CODE ANN. § 51.102 (Vernon 2008); TEX. CODE CRIM. PROC. ANN. art. 26.04 (Vernon Supp. 2010). Article 26.04(a) provides in relevant part as follows:

> The judges of the county courts, statutory county courts, and district courts trying criminal cases in each county, by local rule, shall adopt and publish written countywide procedures for timely and fairly appointing counsel for an indigent defendant in the county arrested for or charged with a misdemeanor punishable by confinement or a felony. The procedures must be consistent with this article and Articles 1.051, 15.17, 26.05, and 26.052.

Appellant next emphasizes that his Sixth Amendment right to counsel attached at his initial appearance before Judge Smith because he was given the *Miranda* warnings and "notice that he was accused of aggravated assault/murder." Based on the assumption that he had been charged with aggravated assault or murder, appellant then concludes that the magistrate did not comply with Article 15.17 of the Code of Criminal Procedure; therefore, his statement was not voluntarily given. TEX. CODE CRIM. PROC. ANN. art. 15.17 (Vernon Supp. 2010).

Appellant relies heavily on *Rothgery v. Gillespie County, Texas*, 554 U.S. 191 (2008), because that case involved an Article 15.17 hearing. The Supreme Court in *Rothgery* referred first to its holdings that the right to counsel guaranteed by the Sixth Amendment applies at the first appearance before a judicial officer (1) at which a defendant is told of the *formal* accusation against him and (2) restrictions are imposed on his liberty. *See Michigan v. Jackson*, 475 U.S.

8

625, 629 (1986); *Brewer v. Williams*, 430 U.S. 387, 398-99 (1977). The specific question in *Rothgery* was whether, under the first requirement, a public prosecutor (as distinct from a police officer) had to be aware of the Article 15.17 proceeding or involved in its conduct. The Court held that it did not.

The police in *Rothgery* relied on erroneous information that Rothgery had a previous felony conviction and arrested him as a felon in possession of a firearm. The officers then brought Rothgery before a magistrate for an Article 15.17 hearing. The arresting officer submitted a sworn "Affidavit of Probable Cause" that described the facts supporting the arrest. After reviewing the affidavit, the magistrate "determined that probable cause existed for the arrest." *Rothgery*, 554 U.S. at 196. Rothgery made several requests for appointed counsel that went unheeded. Six months after the Article 15.17 hearing, Rothgery was assigned a lawyer who assembled the paperwork confirming that Rothgery had never been convicted of a felony. The charges were dismissed. Rothgery then brought the 42 U.S.C. § 1983 action. Even though prosecutors were not involved, the Supreme Court held that the Article 15.17 hearing was the point when adversary judicial criminal proceedings were initiated by a formal accusation. *Id.* at 196-97, 213.

The record in this case reflects that neither condition – a formal accusation or restrictions on appellant's liberty – was met. First, appellant was only a suspect whom the Abilene police wanted to interview to determine his involvement in the death of the victim. Second, appellant was not in custody associated with formal arrest when he gave his statement.

Appellant argues that the form that he first signed was the equivalent of his being charged with the crime at that moment. We disagree. The warnings given to him by Officer Varner began with the following paragraph:

1.  You are/may be charged with having engaged in delinquent conduct and/or conduct indicating a need for supervision within the provisions of Section 51.03 of the Texas Family Code or having engaged in other criminal conduct by reason of you having allegedly committed the violation(s) of <u>Agg Assault/Murder</u>.

The form does not state that he was charged with either crime, and there is no evidence in the record that he was formally charged at that point. Of course, the officers should have marked out the "are." However, Officer Varner explained to him that he had not been charged with anything at that point and that they just wanted to find out if he had any involvement in the event.

More fundamentally, issues regarding a confession of a juvenile, though raised in a criminal forum, are controlled by the applicable provisions of the Texas Family Code. *Nonn v. State*, 117 S.W.3d 874, 882 (Tex. Crim. App. 2003); *Vega v. State*, 84 S.W.3d 613 (Tex. Crim. App. 2002); *Griffin v. State*, 765 S.W.2d 422, 427 (Tex. Crim. App. 1989). TEX. FAM. CODE ANN. § 52.01(a) (Vernon 2008) expressly authorizes a law enforcement officer to take a child into custody without an order of a juvenile court in two situations: pursuant to the laws of arrest or if there are reasonable grounds to believe that the child has engaged in delinquent conduct or conduct indicating a need for supervision. Section 52.01(b) expressly states that the taking of a child into custody is not an arrest except for the purpose of determining the validity of taking him into custody or the validity of a search under the laws and constitution of this state or the United States. There is no evidence that appellant was under arrest when he went with the officers to answer questions about the event. Even if he were under arrest, however, his statement was admissible because (1) he had not been charged with a crime at that point and (2) the requirements of Section 51.095(a)(1)(A) governing a juvenile's written statement were followed. TEX. FAM. CODE ANN. § 51.095 (Vernon 2008).

Detective Golson testified that appellant's name came from a tip by an individual who had called the police. At the time, they did not have anything substantial, just appellant's name. Detective Hobbs also testified about Ussery's tip. When he took over the questioning of appellant, he explained to appellant about Ussery's statement and the initial information from Venzor and Gilbert. Detective Hobbs testified that appellant cried a bit but did not have any hesitation in telling Detective Hobbs and Officer Varner what happened that night. Detective Hobbs testified that appellant never mentioned that the other Hispanic male had a gun.

Custodial interrogation is questioning initiated by law enforcement after a person has been taken into custody or otherwise deprived of their freedom in any significant way. *Cannon v. State*, 691 S.W.2d 664, 671 (Tex. Crim. App. 1985). A child is in custody if, under the objective circumstances, a reasonable child of the same age would believe his freedom of movement was restrained to the degree associated with a formal arrest. *See Martinez v. State*, 131 S.W.3d 22, 32 (Tex. App.—San Antonio 2003, no pet.); *Jeffley v. State*, 38 S.W.3d 847, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd).

Courts consider four factors in making this determination: (1) whether probable cause to arrest existed at the time of questioning; (2) the subjective intent of the police; (3) the focus of

the investigation; and (4) the subjective belief of the defendant. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). Being the focus of a criminal investigation does not amount to being in custody. *See Meek v. State*, 790 S.W.2d 618, 620 (Tex. Crim. App. 1990). When the circumstances show that the individual acts upon the invitation or request of the police and there are no threats, express or implied, that he will be forcibly taken, then that person is not in custody at the time. *Dancy v. State*, 728 S.W.2d 772, 778-79 (Tex. Crim. App. 1987). There is nothing in the record to the effect that there were threats, express or implied, that appellant would be forcibly taken when he voluntarily agreed to go with the police to answer questions.

The record concerning the four factors supports a conclusion that appellant was not in custody equivalent to an arrest until after signing his statement before Judge Smith. The questioning of appellant took place on the afternoon of October 29; the murder occurred around midnight on October 27. The police were just beginning their investigation. Testimony by the police was to the effect that they had received a tip from Ussery and knew from Venzor and Gilbert that two Hispanic males had been involved. Until they questioned appellant, the officers did not know for certain that appellant was involved in the offense. Although they tried to learn from appellant who the other person was, appellant maintained that he did not know the other person. It did not appear from the record that appellant gave any objective indication that he thought he was under arrest.

Officer Varner testified that he first obtains identification information from a juvenile even if the juvenile is not a suspect and then goes over the juvenile rights notification form. Officer Varner testified that he explained to appellant that the form stated that appellant had "allegedly committed the violation of aggravated assault" and that "allegedly" meant that appellant "may have, [or] may not have," committed an assault and the officers wanted "to talk with [him] if [he was] willing . . . and see about [appellant's] possible involvement in the case." Officer Varner then pointed out to appellant that he had the right to remain silent and not make any statement at all. There was no penalty for refusing to say anything. According to Officer Varner, appellant said that he was willing to talk with them.

Officer Varner testified that appellant was not restrained in any way and that, when he went over the third right – the right to have an attorney present before or during any questioning, Officer Varner explained the right. Appellant did not indicate that he wanted a lawyer. Detective Hobbs interviewed appellant after his rights had been read to him by Officer Varner.

11

Appellant testified that Officer Varner had given him the *Miranda* warnings when Officer Varner and Detective Hobbs started talking to him. He acknowledged that he understood the warnings; that he had the right to a lawyer; that he had the right to not talk to anyone; and that, if he could not afford a lawyer, one could be appointed for him. Appellant also testified that he was not put in handcuffs until after he had signed his statement before Judge Smith.

When the Section 51.095 requirements are followed, the written statement of a juvenile is admissible in evidence even if the juvenile was in a detention facility or in the custody of an officer when he gave the statement. Section 51.095(a)(1)(A). The fact that appellant was not under arrest when he was first taken to Judge Smith is an additional reason why his statement was admissible; even if he had been arrested, the result would be the same. The issue of custody equivalent to arrest arises when the requirements of Section 51.095 are not followed. *See Martinez*, 131 S.W.3d at 31-32 (juvenile was not in custody, warnings of Section 51.095 not required); *In re D.A.R.*, 73 S.W.3d 505, 513 (Tex. App.—El Paso 2002, no pet.) (juvenile's oral statements while in custody not admissible because requirements of Section 51.095(a)(5) were not met). The warnings that Judge Smith read and explained to appellant were the warnings required under Section 51.095 for a juvenile's statement to be admissible in evidence at his trial. The warnings were not Article 15.17 warnings that are required only after arrest.

Appellant was "arrested" for purposes of the criminal action when his juvenile transfer order to the district court was entered. TEX. FAM. CODE ANN. § 54.02(h) (Vernon Supp. 2010); *Vasquez v. State*, 739 S.W.2d 37 (Tex. Crim. App. 1987*).* In *Vasquez*, the defendant was a juvenile when he committed the crime, but he was certified as an adult and convicted of capital murder. On appeal, he contended that his confession and a monogrammed cigarette lighter belonging to the deceased were improperly admitted into evidence as both were the fruits of an illegal warrantless arrest. The defendant relied on TEX. CODE CRIM. PROC. ANN. art. 14.04 (Vernon 2005), and the court acknowledged that, had he been arrested as an adult, his warrantless seizure would have been in violation of Article 14.04. *Vasquez*, 739 S.W.2d at 41. The court held that Section 52.01 of the Family Code governing the detention of juveniles, and not Article 14.04 governing the arrest of adults, governed even though the defendant was certified as an adult. The court recognized that Section 52.01, a civil statute, allowed a more liberal manner of taking a known juvenile into custody for further investigation without the

formal stigmatizing procedures accompanying an adult arrest. *Id.* at 42. The court upheld the admission of the confession and the lighter into evidence. *Id.* at 45.

After a pretrial motion to suppress hearing, the trial court below made extensive findings and reached the same conclusion that we have. Appellant never requested an attorney and knowingly and voluntarily waived his right to counsel. Appellant's first issue is overruled.

*Should Appellant's Statement Have Been Suppressed?*

Appellant argues that the statement should have been suppressed because the police violated TEX. FAM. CODE ANN. § 52.02 (Vernon 2008). Section 52.02(a) requires that an officer taking a juvenile into custody, without unnecessary delay and without first taking the juvenile to any place other than a juvenile processing office, shall do one of seven enumerated acts. We initially note that appellant was first taken to a juvenile processing office. Second, appellant's arguments under this issue also proceed under the erroneous assumption that appellant was in custody.

If the juvenile's statement does not stem from a custodial interrogation, then admission of the statement into evidence is not precluded by the Family Code. *Roquemore v. State*, 60 S.W.3d 862, 866 (Tex. Crim. App. 2001); *Martinez*, 131 S.W.3d at 32; *see* Section 51.095. However, even in the absence of custody, due process may be violated by the admission of a confession that was not voluntarily given. *Martinez*, 131 S.W.3d at 35.

In reviewing a motion to suppress, we give great deference to a trial court's determination of historical facts. *Roquemore*, 60 S.W.3d at 866; *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Mixed questions of law and fact that turn on the credibility and demeanor of a witness are reviewed under the almost-total-deference standard, and mixed questions of law and fact that do not turn on the credibility and demeanor of a witness are reviewed de novo. *Roquemore*, 60 S.W.3d at 866. We examine the evidence in the light most favorable to the trial court's ruling. *State v. Ballard*, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999). Here, the trial court filed a lengthy list of its findings of fact, including the finding that appellant was not in custody until after he signed his statement. We reviewed the entire record to determine whether the trial court's findings were supported by the record. We must uphold any finding that is supported by the record absent a clear abuse of discretion. *Meek*, 790 S.W.2d at 620. We have discussed a substantial portion of the record to demonstrate that it supports the trial court's findings.

Even if we were to assume that appellant was in custody, there was no violation of Section 52.02. There was no unnecessary delay, and the officers met the requirements of Section 52.02. In his brief, appellant admits that the police took appellant to a juvenile processing office first, but he argues that the officers erred in asking appellant about his involvement in the events that night and not taking him before Judge Smith without unnecessary delay. Appellant's reading of the statute is mistaken.

Section 52.02(a) provides that a person taking a child into custody, without unnecessary delay and without first taking the child to any place other than a juvenile processing office designated under TEX. FAM. CODE ANN. § 52.025 (Vernon 2008), shall do one of seven actions that are listed. In this case, the officers took appellant first to a juvenile processing office that is in the Juvenile Division area of the Abilene Law Enforcement Center and then to the office of a juvenile officer, Officer Varner. Officer Varner testified that his office had been designated by the Abilene Juvenile Board as meeting the Juvenile Code requirements. Detective Golson testified that his office is part of the juvenile detention center. The officers first took appellant to a juvenile processing office designated under Section 52.025. When appellant was taken to Detective Golson's office, he was taken to one of the seven places under Section 52.02(a). *See* Section 52.02(a)(2).

The Texas Court of Criminal Appeals in *Baptist Vie Le v. State*, 993 S.W.2d 650, 653 (Tex. Crim. App. 1999), pointed out that Section 52.02(a) and Section 52.025 should be read in concert. As the court explained:

> Section 52.02(a) commands the officer taking the child into custody to "do one of the following [seven actions]" "without unnecessary delay" and "without first taking the child to any place" [other than] "a juvenile processing office designated under Section 52.025."

*Baptist Vie Le*, 993 S.W.2d at 653. The statute provides only one exception. The officer may first take the child to "a juvenile processing office designated under Section 52.025." *Id.* That is an option, but it is not a requirement. *Id.* If the officer elects to take the child to a juvenile processing office, Section 52.025 limits what may occur there. *Id.* A child may be detained in a juvenile processing office only for:

> (1) the return of the child to the custody of a person under Section 52.02(a)(1);

14

(2) the completion of essential forms and records required by the juvenile court or this title;

(3) the photographing and fingerprinting of the child if otherwise authorized at the time of temporary detention by this title;

(4) the issuance of warnings to the child as required or permitted by this title; or

(5) the *receipt of a statement by the child* under Section 51.095(a)(1), (2), (3), or (5).

Section 52.025(b) (emphasis added).

The officers were authorized under Section 52.025 to take appellant's statement during his temporary detention. The taking of his statement was governed by Section 51.095. Appellant has admitted that the officers first took him to a juvenile processing office. The officers and Judge Smith then followed the procedure in Section 51.095 for obtaining an admissible statement from appellant.

In *Baptist Vie Le*, the State in the trial court essentially conceded that the juvenile was in custody. 993 S.W.2d at 652. In this case, the State has consistently argued that appellant was not in custody, and we agree. But even if we assume appellant was in custody, *Baptist Vie Le* is still distinguishable. Le was first taken to a juvenile processing office under Section 52.025, but then his statement was obtained at the homicide division – rather than at the juvenile processing office in compliance with Sections 52.025 and 52.02(a). *Id.* at 654-55.

The court in *Baptist Vie Le* pointed out that a juvenile processing office is the only place an officer can take a child other than the five options (now seven) presented in Section 52.02(a).[2] It is, in essence, a sixth option. However, the court made it clear that the taking of a juvenile to a juvenile processing office did not dispense with the requirement that, subsequently, the officer had to "do one of the five possibilities listed" in Section 52.02(a). *Id.* at 653. Therefore, appellant argues here that there was an unnecessary delay in taking him to the justice of the peace. We disagree.

The court in *Baptist Vie Le* held that taking Le to obtain his statement at the homicide division was not one of the options in Section 52.02(a). The court stated, "[The detective]

---

[2]At the time of *Baptist Vie Le*, Section 52.02(a) stated that an officer should do one of five actions. The current version lists seven actions.

should have first, 'without unnecessary delay,' taken Le to a juvenile officer or detention facility." *Id.* at 655. In our case, Officer Varner, Detective Golson, and Detective Hobbs took appellant without unnecessary delay first to the juvenile processing office. The office of Officer Varner, a juvenile officer, was designated by order of the Taylor County Juvenile Court as part of the juvenile processing office and detention facility. Detective Golson's office was also included in the designation by the juvenile court. By taking appellant to the juvenile processing office, the officers were entitled to detain appellant to receive a statement from appellant under Section 51.095. Taking appellant to the offices of the juvenile officers in the detention facility followed the dictate of the court in *Baptist Vie Le*.

Appellant was not in custody. Taking appellant from the school to answer questions was only an investigative detention to determine if appellant had any information regarding the offense. The initial interview by Detective Hobbs lasted approximately twenty minutes. Once the officers determined appellant did have information regarding the offense, they immediately took appellant to the magistrate's office. The officers complied with the requirements of Section 52.02(a).

Appellant's second complaint under Section 52.02 is that the officers did not promptly notify appellant's father as required by Section 52.02(b)(1). After Officer Varner asked for the names of appellant's parents, appellant's date of birth, and a phone number for a parent, Officer Varner gave the phone number for appellant's father to Detective Golson. Detective Golson called that number and left a message for the father to call him as soon as possible.

In *Gonzales v. State*, 67 S.W.3d 910 (Tex. Crim. App. 2002), the court held that the juvenile's written statement was not automatically inadmissible because his parents were not notified in accordance with Section 52.02(b). The court reasoned that, if evidence is to be excluded because of a Section 52.02(b) violation, it must be excluded through the operation of TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005). The decisions of the court have established that evidence is not obtained in violation of a provision of law if there is no causal connection between the illegal conduct and the acquisition of the evidence. *Gonzales*, 67 S.W.3d at 912; *Roquemore*, 60 S.W.3d 862; *Chavez v. State*, 9 S.W.3d 817 (Tex. Crim. App. 2000); *State v. Daugherty*, 931 S.W.2d 268, 269 (Tex. Crim. App. 1996); *Johnson v. State*, 871 S.W.2d 744, 750 (Tex. Crim. App. 1994). The *Gonzales* court then remanded the case to the court of appeals to consider whether there was a causal connection between the failure to notify the

16

parents (the illegality) and the acquisition of the evidence (the statement). 67 S.W.3d at 913-14. In this case, appellant has not shown that there was a causal connection between Detective Golson's failure to notify his father and the acquisition of appellant's statement. *See Pham v. State*, 175 S.W.3d 767, 772-73 (Tex. Crim. App. 2005). In fact, appellant testified that his father visited him at the juvenile center before appellant went before Judge Smith to sign his statement.

Appellant also argues that he was "sweated" into confessing by being left alone in a juvenile processing office in violation of Section 52.025(c). Appellant relies solely on his own testimony that he was left unattended. Officer Varner testified that he did not remember taking appellant into a holding room and leaving him unattended. Detective Golson testified that appellant was not left unattended. The entire process, from picking appellant up from school to his signing his statement, took less than two hours. Appellant was picked up from school at approximately 2:45 p.m., and he was magistrated regarding his statement at 4:10 p.m. There is no evidence that appellant was "sweated" into giving his statement.

The trial court found that appellant did not ask for an attorney; that appellant was not threatened, coerced, or promised anything by the police; that appellant's statement was voluntary and given of his own free will; and that appellant's statement was given in compliance with Section 51.095 of the Family Code. The record supports the trial court's findings. Appellant was lawfully detained in a juvenile processing office and the juvenile offices for the receipt of his statement in compliance with Section 52.025 of the Family Code. The officers did not violate Section 52.02 or Section 52.025. Appellant's second issue is overruled.

*Appellant's Requested Jury Instruction*

In appellant's third issue, he argues that the trial court failed to properly instruct the jury on the "voluntariness" of appellant's confession. When the voluntariness of a defendant's statement is raised at trial, the defendant is entitled to jury instructions thereon. *Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008).

The record in this case shows that the trial court properly instructed the jury on the various issues of voluntariness related to appellant's statement. The jury charge included a general voluntariness instruction, pursuant to TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005), as follows:

> [U]nless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made by the defendant without compulsion or persuasion, or if you

have a reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose nor any evidence obtained as a result thereof.

*See Oursbourn*, 259 S.W.3d at 174-75.

The jury charge also included relevant statutory-warning and exclusionary-rule instructions. *See id.* at 173, 176-78. The trial court instructed the jury that no evidence obtained in violation of any provision of the Constitution or laws of the United States or Texas shall be admitted into evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon 2005) (exclusionary rule). The trial court then instructed the jury that a written statement is admissible if made freely and voluntarily, without compulsion or persuasion, provided that the necessary warnings were given prior to the statement. The trial court set out the warnings required by Section 51.095 of the Family Code and instructed the jury to "disregard the defendant's written statement and not consider it for any purpose" if the jury found that the officers or Judge Smith failed to comply therewith. Next, the trial court set out the provisions of Section 52.02(b) regarding prompt parental notification and instructed the jury that the decision to waive the right to remain silent "must be knowing, intelligent, and voluntary and must not be a product of one's parents not being promptly notified." The trial court instructed the jury to disregard appellant's statement if it found that the statement was the product of appellant's parents "not being promptly notified, and was made falsely or involuntarily." Finally, the trial court informed the jury in accordance with Section 52.025(c) that "a child may not be left unattended in a juvenile processing office" and instructed the jury that the decision to waive the right to remain silent "must be knowing, intelligent, and voluntary and must not be the product of being left unattended in a juvenile processing office." The trial court instructed the jury to disregard appellant's statement if it found that the statement "was the product of being left alone in a juvenile processing office and was made falsely or involuntarily."

We hold that the trial court properly charged the jury regarding the voluntariness of appellant's statement and that it did not err in failing to give the instructions specifically requested by appellant, which were confusing and were also partially inaccurate. In addition to the voluntariness issues discussed above and accurately included in the trial court's charge, appellant requested the inclusion of an instruction that, prior to his statement, appellant must have received "from a magistrate an explanation of the procedures for requesting appointment of counsel." Appellant's requested instruction stems from the post-arrest duties of a magistrate

18

under Article 15.17 and does not accurately reflect the law regarding the admissibility of statements. For the statement of a child to be admissible, the child must be warned – with respect to the appointment of counsel – only that, if he is unable to employ an attorney, he "has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state." Section 51.095(a)(1)(A)(iii). The trial court's charge to the jury tracked the language of Section 51.095(a)(1)(A). We find no error in the jury charge. Appellant's third issue is overruled.

*This Court's Ruling*

The judgment of the trial court is affirmed.


TERRY McCALL

JUSTICE


March 3, 2011

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.